No. 04-717

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 341

STATE OF MONTANA,

        Plaintiff and Respondent,

    v.

ADRIENNE UPSHAW,

        Defendant and Appellant.

APPEAL FROM:    The District Court of the Fourth Judicial District,
                In and For the County of Missoula, Cause DC-2003-267,
                Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Patricia Bik, Attorney at Law, Helena, Montana

        For Respondent:

                Honorable Mike McGrath, Attorney General; Jim Wheelis,
                Assistant Attorney General, Helena, Montana

                Fred Van Valkenburg, County Attorney; Andrew W. Paul, Deputy
                County Attorney, Missoula, Montana

                                    Submitted on Briefs:  October 19, 2005

                                        Decided:  December 21, 2006

Filed:

                      _____
                                     Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Adrienne Upshaw (Upshaw) appeals from a jury verdict, judgment, and sentence of the Fourth Judicial District Court, Missoula County, adjudicating her guilty of the offenses of assault with a weapon, aggravated burglary, and criminal possession of dangerous drugs. We affirm.

¶2 We consider the following issues on appeal:

¶3 (1) Did the State improperly elicit testimony regarding Upshaw's post-*Miranda* silence and is this issue reviewable under the common law plain error doctrine?

¶4 (2) May Upshaw's claims of ineffective assistance of counsel be raised on direct appeal?

¶5 (3) Did the District Court err by failing to consider the presumption that Upshaw was entitled to deferred imposition of sentence for possession of dangerous drugs?

## BACKGROUND

¶6 On June 12, 2003, at approximately 3:00 a.m., Upshaw broke into the home of Brenda Parmer (Parmer) in Missoula, Montana. Parmer, who was sixty-one years old, lived with her son, Brian Pierre (Brian), and her two granddaughters, Brandy Hiner (Hiner) and Lueanna Pierre (Lueanna), Brian's daughter. Four young men assisted Upshaw with the break-in, and all the intruders wore bandanas over their faces. Parmer testified that Upshaw pushed her to the floor and commanded her to "stay." One young man kicked a hole in the bedroom door; another kicked in the door to Hiner's bedroom and kicked her in the face, and Upshaw threatened Hiner with a knife. Lueanna, who shared a bedroom with Hiner, took the telephone into her closet and called the police.

2

¶7 Upshaw and her co-intruders fled before police arrived. In her statement to the police, Hiner identified Upshaw as the assailant. Hiner told the interviewing officer that she was positive it was Upshaw, and that she was afraid she would be killed. Hiner, who was twenty-one years old at the time of trial, testified that she first met Upshaw in jail in 2002, and that they had been friends, but she did not recall for how long. She said that she had kissed Upshaw, but denied any sexual relationship. She testified that she had been at a friend's house on the evening of June 11, 2003, before the assault occurred on the morning of June 12, and that she and Upshaw had had a disagreement. During the trial, Hiner read a portion of her earlier police interview in which she said Upshaw was "psycho because she drinks all the time" and that Upshaw had been angry with her and had acted as if Hiner were "her girlfriend or something."

¶8 Lueanna testified at trial that on June 11, 2003, she picked Hiner up at a mutual friend's house and Upshaw slashed her tires before Hiner got in the car, using a knife with a black handle. Lueanna said she drove away, ruining her tires and rims, because she was frightened and did not want to suffer more damage to her car. Upshaw was arrested the afternoon of June 12, 2003, and the police found a small blue plastic box in her pocket which contained trace amounts of methamphetamine.

¶9 Detective Baker, of the Missoula City Police Department, was the primary investigator in the case. He testified that Hiner and Lueanna immediately identified Upshaw as their assailant in a photographic lineup. Parmer was unable to identify Upshaw in the lineup, but stated that she recognized Upshaw's voice. Brian did not recognize anyone in the six photographs used for the lineup.

3

¶10 The State filed an information charging Upshaw with count I: assault with a weapon, a felony, as specified in § 45-5-213, MCA (2003); count II: aggravated burglary, a felony, as specified in § 45-6-204(2), MCA (2003); and count III: aggravated burglary. Upshaw was represented by counsel, Margaret Borg and Ed Sheehy, at all stages of the trial proceedings. Upshaw entered pleas of not guilty. On November 21, 2003, the State filed an amended information, which added count IV: criminal possession of dangerous drugs, a felony, as specified in § 45-9-102, MCA (2003). At a pretrial conference, Upshaw's counsel declared an intention to file a motion *in limine* to preclude any reference to Upshaw's prior crime of allegedly stabbing her sister. The State advised they would concede this issue. A jury trial was held, and the jury found Upshaw guilty on counts I, II, and IV; count III was dismissed during trial upon stipulation of the parties.

¶11 The District Court sentenced Upshaw to concurrent terms of twenty years with five years suspended on counts I and II, to be served at the Women's Correctional Facility in Billings, Montana. On count IV, Upshaw received a five-year sentence, to run concurrently with the sentences on counts I and II. Upshaw's trial counsel withdrew on June 7, 2004. The court appointed Patricia Bik on July 1, 2004, to represent Upshaw on appeal.

## STANDARD OF REVIEW

¶12 "This Court may discretionarily review claimed errors that implicate a criminal defendant's fundamental Constitutional rights, even if no contemporaneous objection is made and notwithstanding the applicability of § 46-20-701(2), MCA, criteria, where

4

failing to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process." *State v. Godfrey*, 2004 MT 197, ¶ 22, 322 Mont. 254, ¶ 22, 95 P.3d 166, ¶ 22 (citing *State v. Finley*, 276 Mont. 126, 137, 915 P.2d 208, 215 (1996)). "We use our inherent power of common law plain error review sparingly, on a case-by-case basis, and only in the class of cases aforementioned." *Godfrey*, ¶ 22 (citing *Finley*, 276 Mont. at 138, 915 P.2d at 215). "The particular facts and circumstances of each case drive the applicability of the plain error doctrine." *Finley*, 276 Mont. at 134, 915 P.2d at 213.

¶13 We review claims of ineffective assistance of counsel *de novo*. *State v. Turner*, 2000 MT 70, ¶ 47, 302 Mont. 69, ¶ 47, 12 P.3d 934, ¶ 47. We review a criminal sentence for legality to determine whether the sentence is within the parameters provided by statute. *State v. Montoya*, 1999 MT 180, ¶ 15, 295 Mont. 288, ¶ 15, 983 P.2d 937, ¶ 15.

## DISCUSSION

### Issue One

¶14 *Did the State improperly elicit testimony regarding Upshaw's post-Miranda silence and is this issue reviewable under the common law plain error doctrine?*

¶15 Upshaw urges this Court to invoke plain error review and reverse her conviction. She argues that the State violated her constitutional right to due process and privilege against self-incrimination by eliciting testimony from a law enforcement officer at trial that informed the jury of Upshaw's decision to remain silent after she received *Miranda*

5

warnings. Upshaw contends that *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240 (1976), is controlling and requires reversal of her conviction.

¶16  The State responds that the prosecutor did not commit *Doyle* error by eliciting evidence of Upshaw's post-*Miranda* silence. It contends that the evidence came from a non-responsive answer by an officer, and that the prosecutor did not capitalize on the answer. It argues that the remarks at issue here differ in two important respects from those in *Doyle*: the prosecution did not deliberately seek to put the evidence before the jury, and the prosecution did not use the evidence of post-*Miranda* silence to impeach Upshaw.

¶17  In reply, Upshaw argues that the cases the State uses to support its argument are not applicable. She contends that her claim of error mirrors that of the defendant in *Finley*, and thus plain error review is appropriate. Upshaw asserts that the evidence of her post-*Miranda* silence undermined her credibility before the jury. She contends that once her refusal "to tell her side of the story" was put before the jury by Detective Baker, the prosecutor let the inference of guilt raised by her silence "work its magic" on the jury.

¶18  In *Doyle*, the United States Supreme Court held that the State may not seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest. 426 U.S. at 611, 96 S. Ct. at 2241. In *Doyle*, the defendants were arrested together and charged with selling ten pounds of marijuana to a local narcotics bureau informant. They were convicted in separate trials, held approximately one week apart, during which the prosecutor asked each of the two

6

defendants why they had not maintained their innocence and given their "frame-up" story on their arrest. During the course of their state criminal trials, the defendants, who were given *Miranda* warnings after their arrest, took the stand and gave an exculpatory story they had not previously told to the police or the prosecutor. The cross-examination of defendant Doyle contained the following exchange:

> Q. [By the prosecutor] . . . You are innocent?
>
> A. [By Doyle] I am innocent. Yes Sir.
>
> Q. That's why you told the police department and Kenneth Beamer when they arrived—
>
> (Continuing.)—about your innocence?
>
> A. . . . I didn't tell them about my innocence. No.
>
> Q. You said nothing at all about how you had been set up?
>
> Q. Did Mr. Wood?
>
> A. Not that I recall, Sir.
>
> Q. As a matter of fact, if I recall your testimony correctly, you said instead of protesting your innocence, as you do today, you said in response to a question of Mr. Beamer—I don't know what you are talking about.
>
> A. I believe what I said—What's this all about? If I remember, that's the only thing I said.
>
> A. I was questioning, you know, what it was about. That's what I didn't know. I knew that I was trying to buy, which was wrong, but I didn't know what was going on. I didn't know that Bill Bonnell was trying to frame me, or what-have-you.
>
> Q. All right—But you didn't protest your innocence at that time?
>
> A. Not until I knew what was going on.

7

*Doyle*, 426 U.S. at 614, n. 5, 96 S. Ct. at 2243, n. 5. In addition, the court permitted the prosecutors, over objections, to argue the petitioners' post-arrest silence to the jury in their closing arguments. *Doyle*, 426 U.S. at 614, n. 5, 96 S. Ct. at 2243, n. 5. The Supreme Court reversed the conviction and stated:

> [W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

426 U.S. at 618, 96 S. Ct. at 2245.

¶19 Applying *Doyle*, this Court has held that "[o]nce a *Miranda* warning of any sort is given, it is error for a prosecutor to comment on a defendant's post-*Miranda* silence or his failure to offer a post-*Miranda* explanation of the alleged crime." *Godfrey*, ¶ 31. Here, Upshaw argues that the testimony elicited from the detective by the prosecutor violated her right to due process and her privilege against self-incrimination. Because Upshaw's counsel did not object to the testimony at trial, we must first determine whether this issue is reviewable under the common law plain error doctrine.

¶20 In *Godfrey*, this Court held that the plain error doctrine was not applicable. Godfrey's appeal stemmed from two instances of prosecutorial misconduct. First, the prosecutor began his cross-examination of Godfrey as follows:

Q. Mr. Godfrey . . . how old are you?

A. I'll be 35 December 15.

Q. Old enough to have explanations for certain events; isn't that right?

8

A.   I'm not following you.

Q.   Well, you have an explanation for what took place in October in your bus, don't you?

A.   That's the truth.

Q.   And you have another explanation for what took place in the summer of '99 in the bus, don't you?

A.   Yes.

Q.   Okay. And it's been nearly seven months since the time of that initial search warrant, hasn't it been?

A.   Yes.

Q.   So, you had seven months to think up an explanation, isn't that true?

A.   I didn't think nothing up.  I'm telling the truth.

Q.   And this is the first time that anyone has really heard this explanation; isn't that correct?

A.   No, it's not.

*Godfrey*, ¶ 18.  Godfrey's counsel did not object to this line of questioning. The second incident occurred at the end of trial, when the prosecutor, again without objection from Godfrey's counsel, stated in his closing argument: "[h]e knew it was always going to be his word or my word type of thing.  He always knew that.  He's not a dummy.  You saw him testify.  He articulates well.  He's got an explanation.  He's had plenty of time to think about it."  *Godfrey*, ¶ 19.  This Court held, "[w]e conclude that the particular facts of this case do not compel the application of the plain error doctrine because there simply

was no clear comment on or infringement of Godfrey's fundamental right to remain silent." *Godfrey*, ¶ 40.

¶21 In *Town of Columbus v. Harrington*, 2001 MT 258, 307 Mont. 215, 36 P.3d 937, the prosecutor, during a driving under the influence (DUI) prosecution: (1) commented during voir dire that the defendant did not "have to take the stand . . . [h]e can take the stand if he wants to"; (2) elicited testimony that the defendant invoked his *Miranda* rights; and (3) elicited testimony that further police questioning would have been improper after a defendant invokes his *Miranda* rights. *Harrington, ¶* 10. We held that these actions did not constitute *Doyle* error because "[n]o comment was made that Harrington at any time refused to give a statement or refused to testify." *Harrington*, ¶ 17. The fourth error in *Harrington* occurred during closing arguments when the prosecutor stated that the defendant offered no contradictory evidence to dispute the law enforcement officer's observations. Since Harrington himself was the only competent witness who could have offered testimony to counter the officer, this Court concluded that the prosecutor's comment constituted an improper reference to the defendant's decision not to testify. *Harrington*, ¶ 21. We subjected the fourth error to plain error review and concluded that the error was harmless. *Harrington*, ¶ 26.

¶22 In *State v. Sullivan*, 280 Mont. 25, 927 P.2d 1033 (1996), the prosecutor commented on Sullivan's silence in his opening statement, introduced testimony regarding Sullivan's decision to remain silent during direct examination of the detective, and commented on Sullivan's silence twice during his closing argument. Sullivan's counsel did not object to these remarks. This Court invoked the common law plain error

10

doctrine, and determined that Sullivan's constitutional right to due process had been violated. We held that "the prosecutor committed *Doyle* error when he commented on Sullivan's post-*Miranda* silence during the State's opening statement, case-in-chief, and closing argument." *Sullivan*, 280 Mont. at 35, 927 P.2d at 1039.

¶23 Similarly, in *State v. Furlong*, 213 Mont. 251, 690 P.2d 986 (1984), this Court found *Doyle* error when the prosecutor questioned the defendant thusly:

> Q. Is this the first time you have told this story to anyone, Mr. Furlong?
>
> A. Except what I have discussed with my lawyer.
>
> Q. You didn't think to tell the Police, the investigator, the County Attorney this before?
>
> A. Nobody came to me and asked me what happened.
>
> Q. You are charged with a felony crime. Do you understand that?
>
> A. Yes.
>
> Q. You never thought about just mentioning that to somebody, did you?
>
> A. Mentioning what?
>
> Q. That you have no idea how the property got in your car, never crossed your mind to mention that to anybody?
>
> A. What do you mean?
>
> Q. When you were arrested by Sergeant Krakalia, you didn't just happen to mention, I don't know how that property got in there. I loaned my car to Johnny and he came back with it?
>
> A. I didn't say anything.
>
> Q. But you are going to be arrested on a felony crime and you don't think to offer an explanation when you are a totally innocent victim?

11

*Furlong*, 213 Mont. at 256-57, 690 P.2d at 989.  At that point, Furlong's attorney asked that the jury be instructed that nobody is required to give a statement in that situation and what it would prove would be merely speculation; this was overruled.  *Furlong*, 213 Mont. at 257, 690 P.2d at 989.  On appeal, this Court concluded that the prosecutor's extensive cross-examination regarding his post-*Miranda* silence rose to the level of *Doyle* error and denied Furlong's constitutional right to due process.  *Furlong*, 213 Mont. at 258, 690 P.2d at 989.  The *Godfrey* Court distinguished the facts before it from those in *Sullivan* and *Furlong*.  *Godfrey*, ¶ 37.

¶24    In the instant case, Upshaw alleges her constitutional rights were violated during the State's questioning of Detective Baker. The questioning and testimony were as follows, to which no objection was made:

> Q.    [By Mr. Paul] Officer tell us—Detective, tell us what happened next.
>
> A.    [Detective Baker] She [Upshaw] was placed under arrest. She had outstanding warrants, and I told her that we were going to go down to the police department, and I was going to give her a chance to talk to me and be interviewed to provide her side of the story because there's always two sides . . . .
>
> . . . .
>
> Q.    So did you get a chance to speak with the defendant there at the police station?
>
> A.    I spoke with Adrienne Upshaw in—in an interview setting . . . I turned on the audio recording device, cassette tape; again advised her of the Miranda Warning before any questions were asked of her; and she invoked her right to have an attorney before any questions so the interview was stopped. I believe her interview lasted no more than two minutes from the time the tape was on until it was turned off.

12

On appeal, Upshaw concedes that the prosecutor did not comment directly on her silence during opening or closing statements, but argues that the jury instead learned of her decision to exercise her right to remain silent after her arrest through "the carefully crafted" testimony of Detective Baker. Upshaw contends that Detective Baker's testimony "set the stage" for the jury to infer that an innocent person in Upshaw's position would have "seized the chance to talk" to law enforcement and would have told "her side of the story" to clear her name.

¶25 The State contends that neither of the prosecutor's questions invited the detective's answers which revealed Upshaw's post-*Miranda* silence. The State argues that no *Doyle* error occurred because the prosecutor did not attempt to capitalize on the detective's detailed and essentially non-responsive answers, that he did not question or confront Upshaw on this issue when he cross-examined her, and that he did not refer to her post-*Miranda* silence during his final argument.

¶26 The brief mention of Upshaw's choice to remain silent was confined to a minor portion of the detective's testimony. The prosecutor did not pursue this issue, did not use the testimony to impeach Upshaw, and made no mention of it in either his cross-examination of Upshaw or in his closing argument. Unlike in *Sullivan* and *Furlong*, the prosecutor here did not comment upon the fact that Upshaw had failed earlier to volunteer her version of events to the police. "A fundamental aspect of 'plain error,' is that the alleged error must indeed be 'plain.'" *Godfrey*, ¶ 38. The error should leave one firmly convinced that the prosecutor's comments created an inference for the jury that by

13

remaining silent after receiving her rights, the defendant must be guilty of the alleged crime. *Godfrey*, ¶ 38. What occurred here does not lead to this firm conviction.

¶27 We conclude that the facts of this case do not call for the application of the plain error doctrine because there was no clear comment on or infringement of Upshaw's fundamental right to remain silent.

**Issue Two**

¶28 *May Upshaw's claims of ineffective assistance of counsel be raised on direct appeal?*

¶29 Upshaw argues that her trial counsel rendered ineffective assistance of counsel in failing to object to numerous issues at trial, including: (a) testimony alleging that Upshaw packed a knife, testimony regarding Upshaw's other crimes, and testimony regarding an alleged lesbian liaison; (b) the filing of the allegedly unlawful amended information; and (c) the State's alleged *Doyle* error.

¶30 The State argues that Upshaw's ineffectiveness claims should be deferred for post-conviction relief. The State maintains that Upshaw's ineffectiveness claims based on her counsel's failure to object are not record-based because a decision of whether to object to evidence is largely a tactical one, not one dictated by rote observance of evidentiary rules, and counsel should be given an opportunity to explain his tactical decisions.

¶31 In reply, Upshaw argues that she seeks review of her counsel's ineffective assistance under the exception to the record-based rule—namely, that no plausible tactical explanation exists to justify counsel's inaction.

14

¶32     Article II, Section 24, of the Montana Constitution and the Sixth Amendment guarantee a person the right to the effective assistance of counsel.  When reviewing claims of ineffective assistance of counsel, this Court uses the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).  That test requires the defendant to establish that counsel's performance "fell short of the range of competence required of attorneys in criminal cases and that counsel's deficient performance was prejudicial to his case."  *State v. Hendricks*, 2003 MT 223, ¶ 6, 317 Mont. 177, ¶ 6, 75 P.3d 1268, ¶ 6.  There is a strong presumption with regard to the first prong of the *Strickland* test that trial counsel's performance was based on sound trial strategy and falls within the broad range of reasonable professional conduct. *Hendricks*, ¶ 7.

¶33     However, before reaching the merits of an ineffective assistance claim, this Court must first determine whether the allegations are properly before the Court on appeal or whether the claim should be raised in a petition for post-conviction relief, pursuant to § 46-21-105(2), MCA.  *State v. Dyfort*, 2000 MT 338, ¶ 8, 303 Mont. 153, ¶ 8, 15 P.3d 464, ¶ 8.  The general rule is:

> [W]here ineffective assistance of counsel claims are based on facts of record in the underlying case, they must be raised in the direct appeal; conversely, where the allegations of ineffective assistance of counsel cannot be documented from the record in the underlying case, those claims must be raised by petition for postconviction relief.

*Hagen v. State*, 1999 MT 8, ¶ 12, 293 Mont. 60, ¶ 12, 973 P.2d 233, ¶ 12.  The test to determine if an ineffective assistance claim is properly brought on direct appeal is whether the record contains the answer as to "why" counsel took, or failed to take, action in providing a defense.  *State v. White*, 2001 MT 149, ¶ 20, 306 Mont. 58, ¶ 20, 30 P.3d

15

340, ¶ 20. Decisions regarding the number and timing of objections lie within counsel's tactical discretion. *White*, ¶ 16. As a result, "non-record based information explaining the tactic may be involved, and thus [the claim] should be barred from review on direct appeal." *White*, ¶ 16. A non-record based act or omission by counsel can include a failure to object to the admission of evidence, since "the use or non-use of objections may be purely tactical." *State v. Webster*, 2005 MT 38, ¶ 15, 326 Mont. 112, ¶ 15, 107 P.3d 500, ¶ 15. If the record does not fully explain why counsel failed to object to the admission of evidence, the matter is best suited for post-conviction proceedings. *State v. Notti*, 2003 MT 296, ¶ 8, 318 Mont. 146, ¶ 8, 79 P.3d 289, ¶ 8. In *State v. Dyfort*, counsel's failure to object to the admission of a defendant's plea agreement resulted from an off-record discussion at trial. Thus, the record was inadequate to explain why counsel had, in fact, consented to the admission of the evidence. *Dyfort*, ¶ 11. *See also State v. St. John*, 2001 MT 1, 304 Mont. 47, 15 P.3d 970 (counsel's failure to object on the record to a district court's failure to consider sentencing alternatives was not record-based, and therefore was an inappropriate claim for direct appeal).

¶34 An exception to the requirement for a record-based answer as to why counsel acted or failed to act arises where "no plausible justification" exists to counter a claim of ineffective assistance on appeal. *State v. Kougl*, 2004 MT 243, ¶ 15, 323 Mont. 6, ¶ 15, 97 P.3d 1095, ¶ 15. Circumstances in which this exception arises are rare. *Kougl*, ¶ 15. *State v. Jefferson*, 2003 MT 90, 315 Mont. 146, 69 P.3d 641, is an example of when the exception applies. In *Jefferson*, the defendant withdrew a guilty plea to a felony assault charge. In doing so, he indicated that he wished to seek an acquittal. The defendant was

16

subsequently tried for the more serious charge of attempted homicide. In his remarks to the jury, defense counsel admitted that the defendant was guilty of felony assault. This statement totally undermined the defendant's attempt to obtain a complete acquittal on all charges. In that situation, we found that there was "no plausible justification for counsel's conduct under these circumstances." *Jefferson*, ¶ 50.

¶35 As we stated in *Kougl*, "given the existence of a 'plausible' (but not necessarily 'actual') justification, the proper action for this Court was to dismiss the appeal without prejudice and allow the defendant to seek relief through a postconviction hearing." *Kougl*, ¶ 19. Applying the foregoing to the case at bar, we examine each of Upshaw's allegations individually.

**a. Failure to object to character testimony about Upshaw carrying a knife, testimony regarding Upshaw's other crimes, and testimony from Upshaw regarding an alleged lesbian liaison.**

¶36 Upshaw first argues that her trial counsel's failure to object to testimony alleging that she "packed a knife" constitutes ineffective assistance of counsel. Upshaw contends that pursuant to M. R. Evid. 404 and 405, evidence of her character and reputation was inadmissible. She further contends that no plausible explanation can frame counsel's failure to object to the testimony as a tactical decision, and that because of this, the reason why counsel remained silent is irrelevant. The State responds that none of the evidentiary issues that Upshaw appeals support a record-based claim of ineffectiveness. Alternatively, the State contends that Upshaw's argument fails because the testimony was admissible evidence.

17

¶37    Second, Upshaw argues that her trial counsel was ineffective because he did not object to questions regarding her earlier charge for stabbing her sister, a matter on which the District Court had granted her motion *in limine*.  The State argues that this issue is inappropriate for direct appeal and should be reserved for post-conviction relief.  Alternatively, the State argues that Upshaw's answers to other questions opened the door to this topic, and her counsel's failure to object did not constitute ineffective assistance of counsel.

¶38    Third, Upshaw argues that her trial counsel was ineffective because he failed to object to the prosecutor's questioning of herself and Hiner about whether they had a lesbian relationship.  She argues that the questions were irrelevant and inflammatory.  The State argues that this issue is not appropriate for direct appeal and should be reserved for post-conviction relief.  Alternatively, the State argues that evidence of a relationship between Hiner and Upshaw was relevant because it helped establish a motive for Upshaw's behavior.

¶39    Upon review of the record, we determine that it does not fully explain why defense counsel did not object to the testimony.  During the prosecutor's cross-examination of Upshaw regarding her use of knives, three discussions took place off the record, thus making it impossible for us to determine defense counsel's reasons for not objecting to this evidence.  At a March 4, 2004, pretrial hearing, the court granted Upshaw's motion *in limine* to "preclude any reference to [Upshaw's] prior charge of allegedly stabbing her sister."  At trial, during the prosecution's cross-examination of Upshaw, the prosecutor questioned Upshaw regarding evidence of her past crimes,

18

including the stabbing of her sister. The record reveals that defense counsel did not object to either the prosecution's questions or the defendant's testimony regarding the facts and circumstances surrounding Upshaw's prior criminal charge and subsequent conviction. However, a review of the record reveals that, during this testimony, the prosecutor requested to approach the bench, and a discussion took place between counsel and the judge off the record. In addition, during Upshaw's cross-examination, the prosecutor requested a sidebar with counsel before the bench, and the court announced a fifteen minute recess. It was after this break that the prosecutor brought up the June 22, 2001, aggravated assault charge against Upshaw for stabbing her own sister.

¶40 Similarly, during a portion of Hiner's testimony regarding her and Upshaw's relationship, off the record discussions took place—in fact, during Hiner's direct examination, no less than four discussions took place off the record. Obviously, significant discussions were held regarding these evidentiary issues which we have no access to. Consequently, counsel's reasons for not objecting to this testimony regarding other crimes are not discernible from the record, and we will not speculate on those reasons, and whether they were appropriately tactical. Additionally, we cannot conclude that there is no plausible justification for this lack of objections. As we have noted, whether or not to object is typically a tactical decision, *White*, ¶ 16, and we declined to undertake review of an evidentiary issue that involved an off the record discussion in *Dyfort*. *Dyfort*, ¶¶ 11-12. There may be a plausible justification for counsel's actions, and thus the issues should be reserved for a post-conviction relief proceeding.

19

### b.   Failure to object to the amended information.

¶41    Upshaw argues that her counsel was ineffective because he did not object to the amended information, which included two charges of aggravated burglary arising out of a single structural entry.  The State argues that resolution on this matter should likewise await a post-conviction relief proceeding.  Alternatively, the State argues that because one of the aggravated burglary charges (count III) was ultimately dismissed by the court at trial, waiting until that time to dismiss the count did not prejudice Upshaw because the evidence related to the additional count was nevertheless admissible under § 26-1-103, MCA (2003).

¶42    The amended information charged Upshaw with one count of assault with a weapon, two counts of aggravated burglary, and one count of criminal possession of dangerous drugs.  One of the counts of aggravated burglary was later dismissed.  Based on the foregoing analysis and upon our review of the record, we determine that the record does not fully explain why defense counsel failed to object to this charge earlier in the proceeding.  We conclude that there may be a plausible justification, and it is more appropriate for post-conviction relief.

### c.   Failure to object to the State's alleged *Doyle* error.

¶43    Upshaw contends that her counsel's failure to object to Detective Baker's testimony regarding the invoking of her right to silence constitutes deficient performance.  However, as we determined earlier, the State's questioning of Detective Baker did not rise to the level of *Doyle* error, and thus the argument of ineffective assistance of counsel on this point is without merit.

20

¶44 We conclude that we cannot address Upshaw's remaining ineffective assistance of counsel claims without considering matters outside the record. All of her remaining contentions would be more appropriately raised in a post-conviction relief proceeding. Therefore, we dismiss Upshaw's claims of ineffective assistance of counsel without prejudice to post-conviction relief.

## Issue Three

¶45 *Did the District Court err by failing to consider the presumption that Upshaw was entitled to deferred imposition of sentence for possession of dangerous drugs?*

¶46 Upshaw argues that the District Court erred in failing to consider the statutory presumption that she was entitled to a deferred sentence on her conviction for the drug possession charge, pursuant to § 45-9-102(6), MCA (2003). Upshaw contends that the District Court's discussion of the option of deferred sentencing focused exclusively on the violent nature of the offenses enumerated by counts I and II, and the risk to the community posed by a violent offender. Moreover, Upshaw argues that the State presented no evidence to rebut the presumption that she was entitled to a deferred sentencing on count IV. Upshaw concedes that because the court ordered her five-year prison term for drug possession to run concurrently with the two twenty-year terms on counts I and II, she will not be required to serve additional time in prison as a result of the court's failure to consider deferred sentencing on count IV. However, she claims that due to the court's action, she is denied the opportunity to clear the drug possession conviction from her criminal record after a period of deferral.

21

¶47 The State argues that the court did consider Upshaw's request that it defer imposition of sentences on all counts, and declined to grant the request because there was violence was involved in the matter. The State contends that the District Court treated the entire conviction on three counts as instances of the problems that Upshaw presented to the community, and there was no evidence that Upshaw's drug use was an isolated component of her other criminal behavior, and the court was within its bounds on sentencing.

¶48 Section 45-9-102(5), MCA (2003), sets the maximum period of incarceration for the crime of possession of a dangerous drug at five years. Section 45-9-102(6), MCA (2003), further states: "[a] person convicted of a first violation under this section is presumed to be entitled to a deferred imposition of sentence of imprisonment." The District Court addressed defense counsel's recommendation for a deferred sentence in the following terms:

> Deferred imposition of sentence in my general orientation is reserved for those where there is no violence, and generally it's a victimless crime although on occasion there have been victims, and I acknowledge that, but this crime and the risk I think to the community are much greater, and I'm concerned that the next violation might be more severe and that damage to possible victims would be greater if you remained in the community.

The District Court pronounced twenty-year sentences for the offenses of assault with a weapon (count I) and aggravated burglary (count II), and sentenced Upshaw to a five-year commitment to the Women's Prison for the offense of possession of dangerous drugs (count IV).

22

¶49 In *State v. Bolt*, 204 Mont. 261, 664 P.2d 322 (1983), we determined that it is unnecessary to restrict the evidence admissible for overcoming the presumption in favor of deferred imposition of sentence only to evidence relative to the crime charged—possession of a dangerous drug. Rather, the presumption is to be weighed against all other evidence relevant to sentencing. *Bolt*, 204 Mont. at 266, 664 P.2d at 324-25. Here, the District Court judge found Upshaw to be a violent offender. The court determined that Upshaw broke into a residence on June 12, 2003, and threatened Hiner with a knife. The court found that Upshaw remained unlawfully at the residence with the purpose to commit assault on Parmer, and that the arresting officers found drugs on Upshaw's person. Thus, any presumption that Upshaw was entitled to a deferred imposition of sentence was rebutted by the charges themselves and the information at the sentencing hearing.

## CONCLUSION

¶50 We conclude that the State did not improperly elicit testimony regarding Upshaw's post-*Miranda* silence, Upshaw's remaining ineffective assistance of counsel claims are reserved for post-conviction relief, and the District Court correctly considered and rejected the statutory presumption of a deferred imposition of sentence for Upshaw's drug possession charge.

¶51 Affirmed.

/S/ JIM RICE

23

We concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS
/S/ JOHN WARNER

Justice W. William Leaphart dissenting.

¶52    I dissent.

¶53    The prosecutor requested a narrative statement from the State's witness, Detective Baker, "Detective, tell us what happened next."  In response to this open-ended invitation, Detective Baker responded, ". . . I told her that we were going to go down to the police department, and I was going to give her a chance to talk to me and be interviewed to provide her side of the story because there's always two sides . . . ."  The prosecutor then asked the detective to take the matter a step further by asking, "So did you get a chance to speak with the defendant there at the police station?"  To which the detective replied that, yes he did speak with her at the station where he advised her of the *Miranda* warning before any questions were asked of her and that "she invoked her right to have an attorney before any questions so the interview was stopped."

¶54    The question is, did this sworn testimony from the detective violate the principles of the *Doyle* decision?  *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240 (1976).  The State argues that there was no violation of *Doyle* because the testimony was the result of a

"non-responsive answer" and the prosecutor did not seek to capitalize on the testimony to impeach Upshaw.

¶55    The State's argument that the testimony arose from a "non-responsive answer" is somewhat disingenuous given that the prosecutor did not pose a "question" seeking a "response."   Rather, he merely asked the detective to give an open-ended narrative: "Tell us what happened next."  If an attorney chooses to seek narrative answers, he or she must have the witness adequately prepared so as to avoid inadvertent discussion of legally forbidden topics. Whether the detective's testimony was elicited or volunteered, the consequence to the defendant is the same: the jury is informed that the defendant, although given the opportunity, chose not to tell the officer "her side of the story."  The purpose of the *Doyle* rule is not to punish the prosecution but to honor and preserve the defendant's constitutional right to remain silent, irrespective of whether the testimony was intentionally elicited or inadvertently volunteered.

¶56    Similarly, the argument that the State did not attempt to "use" the testimony against the defendant misses the point.  The question is not whether the State used the testimony, but whether the jury "used" or relied on the evidence in reaching its determination of guilt.  We can only assume that the jury considered all the evidence and testimony before it regardless of whether the prosecutor chose to emphasize the testimony or not.

¶57    Finally, as the Court points out, since defense counsel did not object to the detective's testimony at trial, a question is presented as to whether the alleged error should be reviewed under the common law plain error rule.   The Court's opinion is

25

puzzling in this regard in that the Court concludes that there was no plain error. With no objection and no plain error, the Court would normally conclude that the *Doyle* issue is not properly before us. The Court, despite the absence of plain error, nonetheless engages in a *Doyle* analysis and concludes that: "The brief mention of Upshaw's choice to remain silent was confined to a minor portion of the detective's testimony. The prosecutor did not pursue this issue, did not use the testimony to impeach Upshaw and made no mention of it in either his cross-examination of Upshaw or in his closing argument. Unlike in *Sullivan* and *Furlong*, the prosecutor here did not comment upon the fact that Upshaw had failed earlier to volunteer her version of events to the police." ¶ 26. Logic dictates that, unless there was plain error, the Court would not have made these observations which are only relevant to a *Doyle* analysis.

¶58    As indicated above, I would conclude that the errors alleged by Upshaw implicated fundamental constitutional rights and thus amounted to plain error. *State v. Sullivan*, 280 Mont. 25, 32-33, 927 P.2d 1033, 1037-38 (1996). Upshaw, like Sullivan, alleges that the testimony in question violated her right to due process and her privilege against self-incrimination. In *Sullivan* we found plain error and stated:

> Because of the importance of these [fundamental] rights and the effect that a denial of these rights would have on the fairness of a trial, and notwithstanding defense counsel's failure to contemporaneously object or to claim error pursuant to § 46-20-701(2), MCA, our failure to review Sullivan's claims would leave unsettled a question as to the fundamental fairness of his trial.

*Sullivan,* 280 Mont. at 33, 927 P.2d at 1038.

26

¶59    Here, the detective's testimony clearly created an inference for the jury that by remaining silent after having been given an opportunity to tell "her side of the story," Upshaw must be guilty of the alleged crime.  Our failure to find plain error leaves unsettled a question as to the fundamental fairness of her trial.

¶60    Given the *Doyle* error, I would reverse Upshaw's conviction

/S/ W. WILLIAM LEAPHART


Justice James C. Nelson concurs in the dissent of Justice Leaphart.

/S/ JAMES C. NELSON