JUSTICE RICE
delivered the Opinion of the Court.
¶1 Appellant Jeremiah C. Green was convicted of two counts of deliberate homicide by accountability, and one count of tampering with *142 evidence after a jury trial in the Twentieth Judicial District Court, Lake County. Green appeals the District Court’s judgment and commitment. We affirm.
¶2 We address the following issues on appeal:
¶3 1. Did Green’s trial counsel render ineffective assistance by failing to request that the jury be instructed to view accomplice testimony with distrust?
¶4 2. Did the District Court err by admitting evidence of Green’s prior statement that he would like to kill the victim?
¶5 3. Did the District Court abuse its discretion by overruling Green’s objection to the prosecutor’s offering a personal opinion on the credibility of a witness during closing argument?
FACTUAL AND PROCEDURAL BACKGROUND
¶6 In the early morning hours of February 3, 2005, Troy McDonald shot and killed Gerald Sirucek and Catherine Madplume. Testimony elicited at Green’s trial indicated that the previous day, Gerald Gardipee was staying at Green’s father’s house in rural Ronan when Green showed up in his jeep with Sirucek, Madplume, and Madplume’s brother. They hung around for awhile drinking beer and shooting a .22 caliber pistol Green had with him, having stolen it from his cousin several weeks before. When the beer ran out in the early afternoon, the group left and returned to Ronan for more beer, dropping off Madplume’s brother and picking up McDonald. They returned to the house and drank for several hours more, at which point Green, Sirucek and Gardipee drove back to Ronan for more beer. After returning to the house and drinking that 18-pack, Gardipee, Sirucek, and McDonald left again to get another 24-pack of beer. Green stayed behind at the house with Madplume.
¶7 According to testimony from Gardipee, when the three men returned to the house with more beer, Sirucek remained in the jeep, passed out drunk. Gardipee testified that the door to the house was locked when they arrived, but that Green, wrapped in a sheet, eventually opened the door before returning to the back bedroom with Madplume. Gardipee then sat in the living room drinking beer alone for a couple of hours until he heard gunshots outside the house. Gardipee testified that when he stepped out of the house, he saw McDonald standing near the jeep, holding Green’s pistol. McDonald had shot Sirucek nine times. Gardipee testified at trial that he then went back inside the house to tell Green and Madplume what he had seen. However, in contrast to his trial testimony, Gardipee told police *143 shortly after his arrest that Green had been standing outside with McDonald, holding the gun, when Gardipee went outside. Regardless, McDonald then asked Gardipee to help him move Sirucek’s body. The men lifted it out of the jeep and placed it behind a trailer home behind the house. Gardipee then returned to the house only to hear more gunshots from outside the house a few minutes later. Gardipee testified that he then passed out drunk, waking up the next morning to find Sirucek and Madplume’s bodies lying outside on the ground near the trailer.
¶8 McDonald testified at Green’s trial, admitting that he shot both Sirucek and Madplume. The issue at trial was whether Green had aided McDonald in the killings. McDonald’s description of the events differed significantly from Gardipee’s story. According to McDonald, about two weeks before the shootings Green had told him that Sirucek had money and that he wanted McDonald’s help in robbing Sirucek. On the night of the shootings, after McDonald returned from the final beer run, McDonald and Green allegedly discussed a plan in which McDonald would kill Sirucek and Green would kill Madplume. Green retrieved the gun from his jeep, opened the back door, and handed the gun to McDonald. McDonald testified that, with Green beside him, McDonald shot Sirucek nine times as he lay passed out in the back of Green’s jeep. Green then stabbed Sirucek several times in the throat to make sure he was dead, then took Sirucek’s wallet and took the gun from McDonald. The State Medical Examiner testified that the knife marks were not stab wounds and did not cause or contribute to Sirucek’s death.
¶9 McDonald further testified that he and Green returned to the house after shooting Sirucek, at which time Madplume started asking questions about Sirucek’s whereabouts. McDonald and Green once again exited the house and developed a plan to lure Madplume into the trailer behind the house to kill her, eliminating her as a potential witness to their previous murder that evening. Green gave the gun back to McDonald and allegedly threatened to kill McDonald if he backed out. McDonald then shot Madplume several times in the back of the head as she looked for Sirucek in the trailer. McDonald and Green returned to the house, at which time Gardipee allegedly helped the men move Sirucek’s body from the jeep to behind the trailer. They also removed the rear seat from Green’s jeep and left it by the trailer.
¶10 At about 6:30 a.m., Green left for Ronan to clean out his jeep while the other two men stayed behind to sleep, agreeing to deal with the bodies later. Green drove to his Uncle Roy’s house, then to his Aunt *144 Betty’s. After Green gave his aunt a cursory explanation of what happened, she took him to the Tribal Law and Order office to speak with a tribal officer. On the way, Green admitted making the knife marks in Sirucek’s throat, but claimed McDonald had forced him to do so while pointing a gun at his head. Green met with Tribal Officer Ben Asencio and told him that two people had been killed at his father’s house, and that one of them was shot in the back of Green’s jeep. Officer Asencio contacted the Lake County Sherriffs Office. Green retrieved the clothes he was wearing from his Aunt Betty’s house and consented to a blood draw, search of his jeep, and search of his father’s residence. Upon arriving at the house, police saw the two bodies behind the trailer and found McDonald and Gardipee inside the house. Both were arrested without incident, and both subsequently entered plea agreements with the State prior to Green’s trial, agreeing to testify against Green. Gardipee received a ten-year suspended sentence for the offense of tampering with the evidence. McDonald was sentenced to the Department of Public Health and Human Services after the parties stipulated that he was developmentally disabled and was unable to conform his behavior to the requirements of the law. Green rejected the plea agreement offered by the State, and chose to go to trial on the count of tampering with the evidence and both counts of deliberate homicide by accountability.
¶11 Green’s trial began on May 8, 2006, and continued for four days. In addition to the testimony of McDonald and Gardipee, Michael Pierce testified that he lived with Green and Green’s father for a period of time in 2000 and 2001, approximately four years prior to the shootings. Pierce testified that during the time he was living with Green, Green made threats against Sirucek and solicited Pierce to help beat up Sirucek, though the two never did. Green also told Pierce that he would kill Sirucek someday if he had the chance. Shortly thereafter Pierce left Montana. The District Court admitted this testimony over defense counsel’s objection.
¶12 The jury found Green guilty of the two deliberate homicide charges and the tampering with evidence charge. The District Court sentenced Green to two consecutive life sentences on the two deliberate homicide convictions, and to a consecutive term of ten years on the tampering with evidence conviction. Green’s sentences give him no opportunity for parole.
¶13 Green appeals. Additional facts will be discussed herein as necessary.
*145 STANDARDS OF REVIEW
¶14 Claims of ineffective assistance of counsel present mixed questions of law and fact that we review de novo. State v. St. Germain, 2007 MT 28, ¶ 14, 336 Mont. 17, 153 P.3d 591. We review a district court’s ruling regarding the admission of evidence of other crimes, wrongs, or acts for an abuse of discretion. State v. Buck, 2006 MT 81, ¶ 71, 331 Mont. 517, 134 P.3d 53; State v. Aakre, 2002 MT 101, ¶ 8, 309 Mont. 403, 46 P.3d 648. We also review a district court’s ruling on an objection to closing arguments for an abuse of discretion. State v. Ford, 278 Mont. 353, 361-62, 926 P.2d 245, 250 (1996).
DISCUSSION
¶15 Did Green’s trial counsel render ineffective assistance by failing to request that the jury be instructed to view the accomplice testimony of McDonald with distrust?
¶16 Both the Montana Constitution and the Sixth Amendment guarantee a person the right to effective assistance of counsel. When reviewing ineffective assistance of counsel claims, this Court applies the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2025 (1984). The burden is on the defendant to show that defense counsel’s performance “fell short of the range of competence required of attorneys in criminal cases and that his counsel’s deficient performance was prejudicial to his case.” State v. Hendricks, 2003 MT 223, ¶ 6, 317 Mont. 177, 75 P.3d 1268; see also Whitlow v. State, 2008 MT 140, 343 Mont. 90, 183 P.3d 861 (clarifying that the appropriate standard for ineffective assistance claims is not one of neglect or ignorance, but whether counsel’s conduct fell below an objective standard of reasonableness). “There is a strong presumption with regard to the first prong of the Strickland test that trial counsel’s performance was based on sound trial strategy and falls within the broad range of reasonable professional conduct.” State v. Upshaw, 2006 MT 341, ¶ 32, 335 Mont. 162, 153 P.3d 579 (citing Hendricks, ¶ 7); Whitlow, ¶ 21.
¶17 However, before reaching the merits of an ineffective assistance claim we must first determine whether the claim is properly before the Court on appeal. Upshaw, ¶ 33. “The test to determine if an ineffective assistance claim is properly brought on direct appeal is whether the record contains the answer as to ‘why counsel took, or failed to take, action in providing a defense.” Upshaw, ¶ 33 (citation omitted). If the record does not document the allegations of ineffective assistance of counsel, the claim is not properly raised on appeal, but may be pursued *146 in a petition for postconviction relief. Hagen v. State, 1999 MT 8, ¶ 12, 293 Mont. 60, 973 P.2d 233. If a merely “plausible” (but not necessarily “actual”) justification exists for counsel’s conduct, postconviction proceedings are appropriate and the appeal should be dismissed without prejudice. Upshaw, ¶ 35 (citation omitted). “Situations when no justification will exist for counsel’s action are ‘relatively rare.’” State v. Herman, 2008 MT 187, ¶ 16, 343 Mont. 494, 188 P.3d 978 (quoting State v. Kougl, 2004 MT 243, ¶ 15, 323 Mont. 6, 97 P.3d 1095).
¶18 Green’s ineffective assistance of counsel claim is based on § 26-1-303(4), MCA, which provides that “[t]he jury is to be instructed by the court on all proper occasions that ... the testimony of a person legally accountable for the acts of the accused ought to be viewed with distrust,” known as an “accomplice instruction.” Green’s trial counsel did not request an accomplice instruction based upon § 26-1-303(4), MCA, that McDonald’s and Gardipee’s testimony should be viewed with distrust. We have explained “[wjhether a witness for the prosecution is an accomplice is generally a question for the jury, unless the fact is undisputed,” State v. Rose, 1998 MT 342, ¶ 13, 292 Mont. 350, 972 P.2d 321, (citation omitted), but here it is undisputed that Green was being prosecuted as McDonald’s and Gardipee’s accomplice. However, we have recognized that requesting this instruction is not required in all cases. There may be tactical reasons that defense counsel does not want an accomplice instruction given, such as when the instruction would be inconsistent with the defendant’s theory in the case. State v. Johnson, 257 Mont. 157, 163, 848 P.2d 496, 499 (1993).
¶19 In Johnson, the defense theory was that the defendant was not present at the scene of the crime. We held that the accomplice instruction could have been considered inconsistent with that defense and, thus, under those circumstances defense counsel’s decision was tactical and did not amount to ineffective assistance. Johnson, 257 Mont. at 163, 848 P.2d at 499. In contrast, when determining to reverse in Rose, we noted that there was “no indication that counsel made a tactical decision not to request an instruction on accomplice testimony.” Rose, ¶ 18. The State had acknowledged in Rose that such an instruction would have been appropriate. We observed that no plausible explanation existed for failing to request an accomplice instruction under § 26-1-303(4), MCA, when “the accomplice testifies that the accused came up with the idea for the burglary, identified the items to be taken, provided the tools with which to commit the offense, and provided transportation to the scene.” Rose, ¶ 18.
*147 ¶20 Here, one of the two alleged accomplices actually provided favorable testimony for the defense. Although McDonald claimed Green was with him during the shootings, Gardipee testified that Green was in the bedroom when both victims were shot. Considering Gardipee’s favorable testimony, Green’s counsel may have decided to withhold a “viewed with distrust” instruction in order to prevent the casting of any unwanted doubt upon the testimony of a witness who supported the defense theory that Green had not actively participated in either murder.
¶21 Additionally, Green initially indicated he would rely on the affirmative defense of compulsion. See § 45-2-212, MCA. Asserting a compulsion defense could be incompatible with the notion that Green was an “accomplice” in the crimes, and could explain why he did not request the instruction. Potentially inconsistently, however, Green’s counsel did request an accomplice-related instruction under § 46-16-213, MCA, requiring McDonald’s testimony to be “corroborated by other evidence that in itself... tends to connect the defendant with the commission of the offense” in order to convict Green. Once again, there is no indication why defense counsel requested only this accomplice instruction, although Green’s counsel could have believed the jury would view this instruction as placing an additional burden on the State to corroborate McDonald’s testimony.
¶22 Because “plausible” justifications, discussed above, exist for counsel’s conduct, it is not appropriate to address this issue on appeal, where the record does not flush out the factual questions surrounding counsel’s actions. Upshaw, ¶ 35. Consequently, we dismiss Green’s claim of ineffective assistance of counsel without prejudice to raising the claim in postconviction relief proceedings, so the reasons for counsel's failure to request the accomplice instruction can be determined.
¶23 Did the District Court err by admitting evidence of Green’s prior statement that he would like to kill the victim?
¶24 On December 23, 2005, the State filed notice that it intended to introduce evidence that Green stole the .22 caliber pistol used in the homicides, had solicited Pierce to beat up Sirucek, and had stated that he would kill Sirucek someday if he had the opportunity. Defense counsel objected to the introduction of this evidence, specifically asserting that Green’s statements were too remote in time to be admissible. Although Green’s statements to Pierce were made in 2001, the State responded they were evidence of Green’s intent and preparation, and thus were admissible pursuant to M. R. Evid. 404(b). *148 The District Court overruled Green’s objection, and Pierce was allowed to testify at trial.
¶25 The admissibility of other crimes, wrongs, or acts is controlled by M. R. Evid. 404(b), which provides:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
A district court has broad discretion when determining whether other crimes evidence is admissible under M. R. Evid. 404(b). State v. Ayers, 2003 MT 114, ¶ 72, 315 Mont. 395, 68 P.3d 768. A court’s decision to admit such evidence is guided by the Modified Just Rule, which requires four elements be met before the evidence is allowed:
(1) The other crimes, wrongs or acts must be similar.
(2) The other crimes, wrongs or acts must not be remote in time.
(3) The evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity with such character; but may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
(4) Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading of the jury, considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
Ayers, ¶ 73 (citing Aakre, ¶ 9); State v. Matt, 249 Mont. 136, 142, 814 P.2d 52, 56 (1991); State v. Just, 184 Mont. 262, 602 P.2d 957 (1979) (ioverruled on other grounds State v. Swann, 2007 MT 126, 337 Mont. 326, 160 P.3d 511); M. R. Evid. 404(b). When such evidence is introduced, the trial court must “explain to the jury the purpose of such evidence and shall admonish it to weigh the evidence only for such purposes.” Ayers, ¶ 77 (citation omitted).
¶26 Green argues that neither the second nor the fourth requirement of the Modified Just Rule was satisfied here. According to Green, the four-year gap between his statements and the shooting requires exclusion on remoteness grounds because there is no evidence that he engaged in a continuing course of conduct with respect to his threats. Citing State v. Hansen, 187 Mont. 91, 608 P.2d 1083 (1980), Green *149 argues that an event taking place three years prior to the crime charged is too remote unless the acts engaged in constitute a “continuing course of conduct.” Under the fourth requirement, Green argues the evidence was “highly prejudicial and clearly violated the historical purposes for the rule[,] which include protecting the presumption of innocence and limiting the trial evidence to the act alleged.”
¶27 In Hansen, we held that evidence of the defendant’s prior rape of another woman two-and-a-half years prior should have been excluded because the circumstances of that charge were not sufficiently similar to those of the defendant’s current rape charges and were too remote. Hansen, 187 Mont. at 98, 608 P.2d at 1087. We also noted that, “[ajthough a three year interval between a prior act and the charged crime is close to the limit of being too remote, other acts occurring three years prior to the crime have been held admissible when the acts engaged in by the defendant constitutes a continuing course of conduct.” Hansen, 187 Mont. at 97, 608 P.2d at 1087. Contrary to what Green urges, however, this statement was not intended to create a bright-line rule requiring the exclusion of evidence of all prior acts occurring more than three years prior to the charged crime unless there is evidence of a continuing course of conduct. In State v. McKnight, 250 Mont. 457, 463, 820 P.2d 1279, 1283 (1991), for example, we held that a three-year period between incidents was not too remote because the incidents in question were sufficiently similar. “Moreover, we consistently have declined to set arbitrary time limits defining the remoteness factor.” State v. Brogan, 272 Mont. 156, 167, 900 P.2d 284, 291 (1995).
¶28 In the present case, while there may not be clear evidence that Green engaged in a “continuing course of conduct” between his statements in 2001 and the homicides in 2005, there is no dispute that Green’s statement that he would like to kill Sirucek, and the ultimate killing of Sirucek, involve the same parties. More than being merely “similar,” the prior act was a threat to carry out the very crime against the identical victim which ultimately occurred. The fact that Green’s statements and the charged offenses were separated by a three to four year period is offset by the connected nature of these events. A threat to kill an individual is compelling, specific evidence with respect to charges for the subsequent killing of that same individual. The two events cannot be logically separated merely by the passage of a few years between the threat and the actual act.
¶29 Pierce and Green had a falling out soon after Green made the *150 statements, and Pierce moved to another state shortly thereafter. There is no evidence of further efforts by Green to solicit help to commit an offense against Sirucek until several weeks before the killing, when he stole a gun from his cousin and allegedly realized he could manipulate McDonald into robbing and killing Sirucek with the gun. The fact that Green told Pierce he wanted to kill Sirucek if he had the opportunity, and that Sirucek was indeed killed four years later with a weapon Green had stolen only weeks before, is simply too similar to reject as being too remote under the Modified Just Rule. Moreover, the strength in the similarity or connectedness of these facts demonstrates that their probative value was not “substantially outweighed” by the danger of unfair prejudice, under the fourth factor of the Rule. We conclude that the District Court did not abuse its discretion by admitting Green’s prior statements to Pierce under M. R. Evid. 404(b).
¶30 Green also argues that the District Court erred by failing to instruct the jury, at the time the other crimes evidence was introduced, as to the purpose of the evidence and how to weigh it. See Ayers, ¶ 77. Indeed, the court did not give the jury such an instruction until after the State Medical Examiner had testified and the court had recessed for lunch. At that time, counsel for both parties met in chambers, at which time the State presented the court with its proposed Rule 404(b) jury instruction. The court asked both counsel if they objected to the reading of the instruction at that time, and neither did. While counsel for the State suggested the court tell the jury that the instruction ordinarily would have been read at the time the other crimes evidence was introduced, defense counsel preferred a general statement that “this is the proposed time for me to give you this instruction ....” The Court instructed the jury in accordance with defense counsel’s request. Because defense counsel did not object to this procedure, this issue has been waived for purposes of appeal. Section 46-20-104(2), MCA.
¶31 Did the District Court abuse its discretion by overruling Green’s objection to the prosecutor’s offering a personal opinion on the credibility of a witness during closing argument?
¶32 During closing argument, the prosecution discussed the fact that Gardipee had first told the investigating officer that he had seen Green standing beside McDonald after Sirucek was shot, but had later testified that Green was with Madplume inside the house when the shooting occurred. The prosecutor stated:
You heard from a number of witnesses. Only two of them were *151 present and know firsthand what happened. [I’m] going to start with Glen Gardipee. You might wonder why I had Glen testify. Well, I’ll tell you why. There’s two responses. One, I had some faint hope that being under oath and being in a trial situation and facing some sort of pressure he might actually blurt out the truth. The closest he came was admitting to you that he changed his story in order to remove himself as a witness in this case. Well, I didn’t hold out much hope for that one.
Green argues on appeal that this constituted an improper comment on Gardipee’s credibility, although Green’s trial counsel did not object at the time the statement was made. Rather, when the prosecutor later argued about Green’s own credibility, defense counsel objected, stating “it sounds to me like [the prosecutor] is interjecting his own personal opinion as to the credibility of the witnesses and that’s the exclusive province of the jury.” The District Court overruled the objection, and Green does not appeal the court’s decision as it applied to the prosecutor’s statements about Green. Instead, Green contends that the objection should have been sustained with respect to the prosecutor’s statements about Gardipee. The State responds that Green waived his right to appellate review by failing to contemporaneously object when Gardipee’s credibility was challenged, but that even if Green’s objection is considered timely, the prosecutor’s statements were not improper. We agree.
¶33 During closing argument, a prosecutor may comment on “the gravity of the crime charged, the volume of evidence, credibility of witnesses, inferences to be drawn from various phases of evidence, and legal principles involved, to be presented in instructions to the jury....” State v. Staat, 251 Mont. 1, 10, 822 P.2d 643, 648 (1991) (quotations omitted). While it is generally improper for the prosecution to offer personal opinions as to the credibility of the accused or the witnesses, State v. Stringer, 271 Mont. 367, 380, 897 P.2d 1063, 1071 (1995), “it is proper for a prosecutor to comment on conflicts and contradictions in testimony, as well as to comment on the evidence presented and suggest to the jury inferences which may be drawn therefrom.” State v. Gladue, 1999 MT 1, ¶ 15, 293 Mont. 1, 972 P.2d 827.
¶34 Here, the prosecutor was primarily reminding the jury of the inconsistency between Gardipee’s statement to the police after his arrest and his later testimony. In the first instance, Gardipee told investigators that Green had been outside the house with McDonald when Sirucek was shot. Later, Gardipee testified that Green was inside the house with Madplume. The prosecutor was entitled to point *152 out the inconsistencies and to allow the jury to infer that Gardipee changed his story after having time to think about the consequences. The prosecutor was likewise entitled to argue which of the two versions provided by Gardipee was the truth. While that discussion lapped over into “why” the prosecutor had called Gardipee as a witness, a prosecutor is entitled to some latitude in his argument about a witness’s credibility. See State v. Hanson, 283 Mont. 316, 326, 940 P.2d 1166, 1172 (1997). We conclude the prosecutor’s statements do not require reversal.
¶35 Affirmed.
JUSTICES WARNER, LEAPHART and MORRIS concur.