JUSTICE BAKER
delivered the Opinion of the Court.
¶1 Jimmie Lee Aker appeals the judgment entered by the Montana Third Judicial District Court, Powell County, after a jury convicted him of sexual intercourse without consent following a four-day trial in May 2011. Aker appeals his conviction on the grounds that the prosecutor committed plain error during closing argument and that Aker’s counsel provided ineffective assistance during the trial. We affirm.
¶2 We address the following issues on appeal:
¶3 1. Whether plain error review should be exercised to grant Aker a

new trial on his claim of prosecutorial misconduct during closing arguments.

¶4 2. Whether Aker received ineffective assistance of counsel due to his counsel’s failure to object to hearsay testimony that bolstered the victim’s credibility.
PROCEDURAL AND FACTUAL BACKGROUND
¶5 On June 10, 2010, the Powell County Attorney filed an information charging Aker with one count of sexual intercourse without consent, a felony, in violation of §45-5-503(1), MCA, and two misdemeanor charges that are not at issue in this appeal. The felony count alleged that between November 1,2009, and December 31,2009, Aker engaged in sexual intercourse without consent with C.Y. The date of the offense was in dispute, but alleged to have been near C.Y.’s twelfth birthday, which was in late November 2009.
¶6 As is common in cases alleging sexual contact with a minor child, the defendant was well known to the alleged victim and there were no eyewitnesses to the event. As such, the outcome of the trial depended on who the jury believed. Each party called numerous witnesses in its case in chief and both sides conducted vigorous cross-examination in order to undermine the other’s theory.
¶7 At trial, C.Y. testified that in November or December of2009, she was babysitting L.L., her cousin, and several other small children, at her cousin’s house. When she arrived at the house, L.L.’s mother Amie and stepfather Donald, as well as two other adults, were making dinner for the children. At some point after dinner, all of the adults left the house, leaving C.Y. in charge. After C.Y. had put the children to sleep, she testified that she went downstairs to watch a Hannah Montana television show.
*493 ¶8 Aker previously had dated C.Y.’s aunt, and C.Y. testified that ‘he was like an uncle” to her. While C.Y. lay on the couch watching television in her pajamas, Aker entered the room. C.Y. testified that he walked over to her, pulled down her pajama pants and underwear, and “put his first two fingers inside [her vagina]” while ‘he had the other hand on [her] chest.” C.Y. pretended that she was sleeping during the incident, which she stated lasted for twenty minutes; afterwards, Aker washed his hands and, before leaving, he told C.Y. that she “couldn’t tell anyone or [she] would get in trouble and he would too.” C.Y. then went to the bathroom and, when she wiped herself, she discovered that she was bleeding, which scared her. For several weeks, C.Y. did not tell anyone what had happened because she felt like she had done something wrong.
¶9 C.Y. testified that, eventually, she confided in her mother’s best friend, Cari, and told her what Aker had done. Cari testified that C.Y. gave her a “full account” of what happened. Cari’s recollection of her conversation with C.Y. was consistent with C.Y.’s testimony, with some differences. Cari testified that C.Y. told her that she and Aker had a short conversation before he “walked over and he kind of grabbed her by the shoulders ... and laid her down on the couch.” Cari also recalled that C.Y. said that she struggled, and Aker told her “this is normal,” before unbuttoning her pants. C.Y. also told Cari that the incident lasted half an hour and that she waited until she heard Aker’s car leave before she used the bathroom. Aker’s attorney did not object as Cari relayed what C.Y. had told her. Cari also testified about the conversation she subsequently had with C.Y.’s mother, Jennifer.
¶10 The State called Jennifer as its next witness. Although C.Y. has never spoken with her mother about what Aker did to her, Jennifer did testify about her phone conversation with Cari after C.Y. informed Cari of what had happened. Jennifer testified that Cari told her that C.Y. ‘had been sexually molested... [by] Jim Aker.’’Aker’s attorney did not object as Jennifer recalled what Cari previously had told her on the telephone.
¶11 After Jennifer testified, the State called Dr. Michelle Corbin, an expert in family medicine. Dr. Corbin testified that Powell County Sheriff Scott Howard referred C.Y. to her and that she performed a sexual abuse examination of C.Y. nearly two months after the assault. Dr. Corbin explained that C.Y. had described the incident to her-fehat it was a one-time event that lasted for twenty minutes and that Aker had penetrated her vagina with two fingers. Dr. Corbin also explained that, even though she did not find any physical evidence of the assault, that did not surprise her and it did not call into question the veracity *494 of C.Y.’s account because such an injury usually heals within twenty-four to forty-eight hours. Aker’s attorney did not object during Dr. Corbin’s testimony.
¶12 Next, the State called Kristi Rydeen, a licensed clinical professional counselor, to testify. In addition to testifying about C.Y.’s general demeanor during counseling sessions, Rydeen testified that C.Y. told her about ‘the incident of abuse perpetuated by Jimmie Aker.” On redirect, the prosecutor asked Rydeen, Ti]n your discussions with [C.Y.] did she reference or did you find any other trauma that would explain the symptoms you were observing and having been reported, other than sexual abuse by [Aker]?” Rydeen responded “no.” Aker’s attorney did not object to those statements identifying Aker as the assailant.
¶13 The defense theory was that Aker could not have committed the crime because he “didn’t go to that house” on the night C.Y. was there and because, due to a recent back injury, he physically was incapable of being in the position C.Y. claimed he took during the assault. Though he did not object to their direct testimony, Aker’s counsel cross-examined the State’s witnesses about certain details in C.Y.’s statements to them to illuminate inconsistencies. For example, he established that C.Y. had related different dates when the offense occurred, whether Aker was standing, kneeling, or on the couch when he assaulted her, where his hands were on her upper body, and whether any of the adults had come home while she was still awake. He also brought out through the State’s witnesses other issues and circumstances in C.Y.’s life as alternative explanations for her anxiety and nightmares, including, in part, bullying at school and by her brother and having a father in jail and a mother in military combat duty overseasr
¶14 In his case in chief, Aker called Sheriff Howard to testify about prior inconsistent statements C.Y. made to Howard regarding the date on which the incident occurred and what Aker had told her that night. Under questioning by Aker’s counsel, Howard acknowledged that C.Y. had mistakenly or erroneously alleged that Aker saw her and waved to her during a community gathering months after the assault; an investigation determined that it could not have been Aker. On cross-examination by the State, Howard testified about additional statements C.Y. made during the interview that were consistent with C.Y.’s trial testimony. Aker’s attorney did not object to that testimony. ¶15 Aker also presented evidence that C.Y. only stayed the night at her cousin’s house on one occasion in November and December of2009. Aker called three adult witnesses who shared the home-L.L.’s mother, *495 Amie, L.L.’s step-father, Donald, and Donald’s sister, Angela. All three testified that they were friends with Aker, that C.Y. stayed overnight at the house only one time during the period charged, and that Aker did not visit the house on that night. Aker also called nine-year-old L.L., who testified that C.Y. had only spent the night at her house once, that Aker was not there that night, and that she never told C.Y. that Aker had touched her. That statement contradicted the testimony of Mary Pat Hansen, a nurse practitioner who had conducted a forensic interview of C.Y. and testified in the State’s case in chief. Hansen acknowledged on cross-examination that C.Y. reported to her that L.L. told C.Y. that Aker also had “touched her” in her “private spots.” Aker also introduced testimony, including his own, that he could not have sexually assaulted C.Y. in the manner that she described because he was recovering from a severe back injury in November and December of 2009. The State attempted to discredit Aker’s witnesses, pointing out that they all were very close friends and that Aker spent considerable time at their home during the time period in question, when both he and Amie were off work recovering from injuries. The State impeached Amie with evidence that she had lied about whether she sustained her injury from an assault at work or a slip and fall.
¶16 In closing arguments, the prosecutor argued that C.Y. was a credible witness because the core details of the statements she provided to Cari, Sheriff Howard, Dr. Corbin and Rydeen were consistent:
And what you heard when she testified is that the core, core details about Mr. Aker coming into that home when the kids were sleeping, walking across that room, coming up to her while Hannah Montana was on, sexually assaulting her, pushing her down, placing his fingers in her. Those core details have never changed. Hannah Montana was always on tv every time she told the story.
Those core details, the details that we would expect a child to remember, the blood, the spotting, the blood, those details have never ever changed. How in the world would [C.Y.] discuss blood in these interviews, the spotting afterwards, wiping herself when Mr. Aker left the house; unless this actually happened.
¶17 After recounting the evidence and discussing C.Y.’s testimony and her demeanor in the courtroom, the prosecutor argued that C.Y.’s testimony was truthful:
I’d ask you to consider this, Ladies and Gentlemen, that this case is not overly complicated, it’s rather simple. I ask you to consider *496 this; that when [C.Y.] came into the courtroom and told you her story, that she did so for the simple reason that she was telling you the truth; no motive, no other reason.
¶18 The prosecutor contrasted C.Y.’s allegedly truthful testimony with the testimony of the defense witnesses. He argued that, in spite of a bad back, Aker was capable of doing many things and could have committed the act alleged, and that Aker’s friends had “[come] into this courtroom and lied” when they stated that Aker did not visit the house the one night C.Y. was there:
[Y]ou need to look at these people that testified. Certainly they had a strong, strong motive to lie. And it’s really, it’s kind of, if you knew what was going on in the case, it’s pretty unsophisticated really. I mean it’s an unsophisticated lie. ‘We all just say that we were there that night, and we never left, we never left that night. We’ll just say that.’ And that Jim Aker never came over. Pretty unsophisticated. ‘That’s what we’re going to remember.’ ‘Let’s just all remember that, that we never left that night’. Pretty unsophisticated. It’s not really hard to remember that part of it. And I’m not saying they’re unsophisticated, I’m saying the lie is unsophisticated. ‘That we just say we were there that night.’ Like very, very powerful if you believe it. That unsophisticated lie has the power to rob [C.Y.] of justice for the rest of her life. So we think about this case. Look at their testimony.
¶19 The prosecutor elaborated on the credibility of the defense witnesses:
So it’s very important that you assess ... the credibility of those three people. And keep in mind that idea, [because] we’re all in from different parts of society, from different social stratus [sic]. Think about those people. I don’t want to disparage them anymore, but these are people who couldn’t be asked to take the gum out of their mouth when they were testifying, to change into jeans in the courtroom, to wear something other than sweats and sandals. In that group of people where you’re unemployed and collecting unemployment or workers’ comp, and you play video games all day, that, there is a nobility for them in the idea that you protect your innocent friend. You rally around him. The problem with that, Ladies and Gentlemen, is that by doing so they are attempting to rob that little girl of the justice that she requires, the justice that we all require. And that’s why we can’t let it go, and that’s why we have to tell you that they’re not being truthful.
*497 So it’s not about them just protecting their friend too. Let’s also consider their own self-interest. Consider this, how much would they want to admit, and again I have to draw you back to their social strata. How much would they want to admit that on that Friday night when they were staying up until 2:00 o’clock in the morning. We didn’t ask them what they were doing, we didn’t ask them if they were drinking or if they were doing drugs, I think we knew that they would say ‘no’. But how much would they want to admit that they left on that Friday night, their two, 2 year old kids alone, even asleep, and little 8 year old [L.L.], and left her in the care of a 12 year old girl? That’s their own self-interest. Do you think they’re cognizant of maybe Child Protective Services hearing about that? So it’s not just them protecting their friend. They’ve got their own reasons to protect themselves.
¶20 Aker’s counsel did not object to any of these statements. Before concluding, the prosecutor reminded the jury that his argument ‘isn’t evidence. If I said anything here, if you think in any way that I misstated the evidence, disregard it. It’s your job to. I don’t get to testify.” The jury returned a guilty verdict. Aker appeals.
STANDARD OF REVIEW
¶21 We generally “do not address issues of prosecutorial misconduct pertaining to a prosecutor’s statements not objected to at trial.”State v. Longfellow, 2008 MT 343, ¶ 24, 346 Mont. 286, 194 P.3d 694. We may review such an issue, however, under the plain error doctrine. State v. Lacey, 2012 MT 52, ¶ 14, 364 Mont. 291, 272 P.3d 1288. We apply plain error review only ‘in situations that implicate a defendant’s fundamental constitutional rights when failing to review the alleged error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process.” State v. McDonald, 2013 MT 97, ¶ 8, 369 Mont. 483, 299 P.3d 799 (citing State v. Hayden, 2008 MT 274, ¶ 17, 345 Mont. 252, 190 P.3d 1091). The decision to invoke plain error review is “a discretionary one.” Hayden, ¶ 17.
¶22 “Only record-based ineffective assistance of counsel claims are considered on direct appeal.” State v. Howard, 2011 MT 246, ¶ 18, 362 Mont. 196, 265 P.3d 606. To the extent such claims are reviewable, “they present mixed questions of law and fact that we review de novo.” Howard, ¶ 18.
*498 DISCUSSION
¶23 1. Whether plain error review should be exercised to grant Aker a new trial on his claim of prosecutorial misconduct during closing arguments.
¶24 Both the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution guarantee criminal defendants “the right to a fair trial by a jury.” Hayden, ¶ 27. A prosecutor’s misconduct “may be grounds for reversing a conviction and granting a new trial if the conduct deprives the defendant of a fair and impartial trial.” McDonald, ¶ 10 (quoting Hayden, ¶ 27). We “consider alleged improper statements during closing argument in the context of the entire argument.” State v. Makarchuk, 2009 MT 82, ¶ 24, 349 Mont. 507, 204 P.3d 1213. We do not presume prejudice from the alleged prosecutorial misconduct; rather, the “defendant must show that the argument violated his substantial rights.” McDonald, ¶ 10 (quoting Makarchuk, ¶ 24).
¶25 Aker contends that “the State improperly commented on witness credibility” during closing arguments in contravention of his right to a fair trial by characterizing C.Y.’s testimony as truthful and by portraying the defense witnesses as liars and unproductive members of society. Although he recognizes that his attorney did not object to any of the comments he claims were improper, Aker argues that plain error review is warranted under State v. Hayden. The State counters that declining to review the alleged misconduct would not result in a manifest miscarriage of justice, leave unsettled the fundamental fairness of the trial, or compromise the integrity of the judicial process. Instead, the State argues that the prosecutor “appropriately explained to the jury that it would have to resolve issues of credibility” and further explained “what factors it could consider in doing so.”
¶26 An attorney ‘invades the jury’s province and engages in highly improper behavior when [he] characterizes the defendant or witnesses as liars or offers personal opinions on a witness’s credibility.”State v. Racz, 2007 MT 244, ¶ 36, 339 Mont. 218, 168 P.3d 685 (citing State v. Hanson, 283 Mont. 316, 326, 940 P.2d 1166, 1172 (1997)); see also Mont. R. Prof. Cond. 3.4(e) (lawyer shall not state personal opinion as to the credibility of a witness). On the other hand, ‘it is proper ‘to comment on conflicts and contradictions in testimony, as well as to comment on the evidence presented and suggest to the jury inferences which maybe drawn therefrom.’ ” State v. Daniels, 2003 MT247, ¶ 26, 317 Mont. 331, 77 P.3d 224 (quoting State v. Gladue, 1999 MT 1, ¶¶ 14-15, 293 Mont. 1, 972 P.2d 827). Moreover, to properly preserve the issue for appeal, “the defendant must make a timely objection or it is *499 considered waived.” Racz, ¶ 36 (citing §46-20-104(2), MCA); see also State v. Rose, 2009 MT 4, ¶ 106, 348 Mont. 291, 202 P.3d 749.
¶27 As we recently discussed in McDonald, although a prosecutor must avoid offering personal opinion, comment is appropriate “on ‘the gravity of the crime charged, the volume of evidence, credibility of witnesses, inferences to be drawn from various phases of evidence, and legal principles involved’ ”in the instructions to the jury. McDonald, ¶ 14 (quoting State v. Green, 2009 MT 114, ¶ 33, 350 Mont. 141, 205 P.3d 798). A prosecutor’s argument is not plain error if made in the context of discussing the evidence presented and how it should be used to evaluate a witness’s testimony under the principles set forth in the jury instructions. McDonald, ¶ 15.
¶28 Aker’s reliance on Hayden is unpersuasive. While we faulted the prosecutor in that case for voicing his “opinions during closing arguments regarding the credibility of witnesses,” Hayden, ¶ 29, our decision was based on “multiple errors committed by the prosecutor.” McDonald, ¶ 12. Most notably, the prosecutor had elicited what amounted to expert opinion testimony from its law enforcement witness that the victim and another key fact witness were telling the truth. In closing argument, the prosecutor then told the jury it could “rely on” the officer and that both the officer and the victim were ‘believable.” Hayden, ¶ 32. Additionally, the prosecutor improperly testified ‘by vouching for the efficacy of the search of [the defendant’s] residence” and by “stating his opinion that a scale found in the residence was used for drugs.” Hayden, ¶ 32. We invoked plain error review because the cumulative effects of these instances of prosecutorial misconduct “[left] unsettled the question of the fundamental fairness of the proceedings.” Hayden, ¶¶ 29-33; see also McDonald, ¶¶ 12-13.
¶29 As the State points out, there are numerous instances in which we have refused to conduct plain error review of a prosecutor’s comments regarding witness credibility in closing arguments, even in cases where we have concluded that the comments were improper. We declined review, for example, when a prosecutor categorized a defense witness “as a ‘liar,’ while arguing the State’s evidence was genuine and truthful[.]” State v. Lindberg, 2008 MT 389, ¶ 33, 347 Mont. 76, 196 P.3d 1252. In Lindberg, we unanimously determined that “the prosecutor’s comments [did] not rise to a level sufficient to invoke the plain error doctrine[,]”even though we disapproved of the prosecutor’s *500 comments. Lindberg, ¶¶ 34-35.[1]
¶30 Our decision in Lindberg was not unusual-we generally have refused to invoke plain error review of allegedly improper closing arguments regarding witness credibility. Rose, ¶¶ 105-07 (prosecutor argued in closing that defendant had “[gotten] up and [told] the big lie”); Lacey, ¶¶ 18-26 (prosecutor argued that the State’s witness was “candid,” whereas the defendant was not candid and was, ‘by God,” guilty); McDonald, ¶¶ 5-17 (prosecutor argued that State’s witnesses were “completely believable” and “telling [the jury] the truth”; prosecutor’s comments were tied to what he believed the evidence showed); State v. Thorp, 2010 MT 92, ¶¶ 18, 26-28, 356 Mont. 150, 231 P.3d 1096 (in a sexual intercourse without consent case, prosecutor told jury that the victim was “a very credible witness” who had “no reason to lie”; prosecutor also said she thought the jury should believe the victim); Racz, ¶¶ 35-36 (in closing arguments, prosecutor stated the State’s witness had ‘bo reason to lie,” was ‘honest” and ‘told the truth”); State v. Arlington, 265 Mont. 127, 157-61, 875 P.2d 307, 325-28 (1994) (prosecutor stated “a number of times [that the defendant] had lied to the jury”); State v. Rogers, 257 Mont. 413, 417-20, 849 P.2d 1028, 1031-33 (1993) (prosecutor “called the defendant and his son liars during closing argument”). Hayden appears to be the only time we have granted a party’s request to invoke plain error review on the ground that a prosecutor made improper comments regarding witness credibility to which the defendant failed to object. See Longfellow, ¶ 24. Aker points to no other case where we invoked plain error review on these grounds.
¶31 Since there were no witnesses to the claimed encounter, the entire trial of this case was about who was telling the truth. As the prosecutor argued, the jury either could believe twelve-year-old C.Y. or could believe Aker and his three friends. Though the prosecutor used the word “lie,” defense counsel had used that same word in questioning Aker’s witnesses whether they had “cook[ed] up a story” to protect their friend and whether they would ‘lie for Jimmie [Aker] even though he’s [like] family.” The prosecutor tied his remarks to evidence presented at trial and to the court’s instruction that, in determining witness credibility, the jury was to consider “every matter in evidence that tends to indicate whether a witness is worthy of belief.” Each party’s closing argument focused on why the jury should believe that party’s witnesses and not those of the other side. Without *501 parsing each of the prosecutor’s comments, in the final analysis-having reviewed the trial transcript and considered the comments in the context of the entire argument and in light of the specific evidence presented by both sides-we are not convinced that failure to review Aker’s claims will result in a manifest miscarriage of justice, leave unsettled the fundamental fairness of his trial, or compromise the integrity of the judicial process. By failing contemporaneously to object to the prosecutor’s comments concerning witness credibility, Aker waived his right to do so on appeal. Rose, ¶ 106.
¶32 2. Whether Aker received ineffective assistance of counsel due to his counsel’s failure to object to hearsay testimony that bolstered the victim’s credibility.
¶33 Aker contends that his lead trial attorney, William Hooks, provided ineffective assistance of counsel when he failed to object at numerous points during the trial, including: (1) when Cari, Jennifer, and Sheriff Howard testified about statements C.Y. made describing the alleged abuse; (2) when Dr. Corbin testified about statements that C.Y. made to her describing the abuse; (3) when Dr. Corbin testified that the lack of any physical findings two months after the assault did not ‘have any reflection on the veracity of [C.Y.’s] report” because C.Y.’s injuries would have healed within a few days; and (4) when Rydeen testified that C.Y. had identified Aker as the perpetrator during counseling sessions. Aker contends that “a failure to raise an objection, generally, has been deemed record based, and therefore appropriate for direct appeal.” The State counters that “there is a plausible explanation for defense counsel’s decision not to object.”The State argues that Hooks’s lack of objection reflected a broader trial strategy designed to allow Aker to expose “inconsistencies in C.Y.’s prior statements in order to highlight those inconsistencies to the jury during cross examination of the State’s adult witnesses” without directly cross-examining the young victim about discrepancies in her story.
¶34 The right to effective assistance of counsel is guaranteed by both the United States and Montana Constitutions. State v. Kougl, 2004 MT 243, ¶ 11, 323 Mont. 6, 97 P.3d 1095. Before reaching the merits of an ineffective assistance of counsel claim in a direct appeal, we “must first determine whether the allegations are properly before the Court on appeal or whether the claim should be raised in a petition for post-conviction relief’pursuant to §46-21-101, MCA. State v. Upshaw, 2006 MT 341, ¶ 33, 335 Mont. 162, 153 P.3d 579. To make this determination, we ask “‘why’ counsel did or did not perform as alleged *502 and then seek to answer the question by reference to the record.” Howard, ¶ 21 (quoting Kougl, ¶ 14). If the claim is based on matters outside of the record, Ve will refuse to address the issue on appeal.” Kougl, ¶ 14. Only through a petition for postconviction relief may the record be developed to explain “why” counsel acted as alleged, which then allows a reviewing court to determine “whether counsel’s performance was ineffective or merely a tactical decision.” Kougl, ¶ 14. ¶35 We have regarded an alleged failure to object to witness testimony as “record-based, and therefore appropriate for direct appeal.” State v. White, 2001 MT 149, ¶ 15, 306 Mont. 58, 30 P.3d 340. We also have recognized, however, that “decisions regarding the timing and number of objections lie within counsel’s tactical discretion, which would indicate that non-record based information explaining the tactic may be involved, and thus should be barred from review on direct appeal.” White, ¶ 16 (citing State v. Brown, 228 Mont. 209, 212, 741 P.2d 428, 430 (1987)). If the record does not ‘fully explain” why the attorney failed to object, the matter ‘is best suited for post-conviction proceedings.” Upshaw, ¶ 33; see also State v. Dyfort, 2000 MT 338, ¶¶ 9-12, 303 Mont. 153, 15 P.3d 464 (holding that, because the record was silent as to the attorney’s trial strategy regarding his failure to object, the defendant’s objections were not record based).
¶36 We agree with the State that it is plausible that Aker’s attorney made a tactical, strategic decision by not objecting to the testimony that Aker now contests on appeal. Hooks did object, successfully, to numerous questions during the State’s cross-examination of Aker’s witnesses. ‘Counsel’s use of objections lies within his or her discretion.” Riggs v. State, 2011 MT 239, ¶¶ 53-54, 362 Mont. 140, 264 P.3d 693 (rejecting ineffective assistance of counsel claim based on failure to object to child victim’s prior consistent statements in light of counsel’s postconviction testimony that he wanted to point out inconsistencies in the witnesses’ testimony).
¶37 Hooks argued in closing that it was not unreasonable for the defense witnesses, all of whom shared the home where the assault allegedly occurred, to talk to each other about the fact that someone they considered family was accused of a crime ‘they know he could not have committed,” and that this did not mean the three had conjured a lie to protect their friend. His closing argument focused on all the mistakes C.Y. made in the stories she told others and on the inconsistencies in her various statements about the event. Hooks told the jury it could not ignore those inconsistencies in judging the credibility of her accusations. Without directly attacking the victim, he suggested the evidence showed other anxiety-producing factors in her *503 life that could explain her accusations. While it was impossible to know the cause, Hooks argued, that wasn’t Aker’s burden to demonstrate, and the State had not proven guilt beyond a reasonable doubt. Because the trial record does not include Hooks’s explanation of his trial strategy concerning C.Y.’s prior consistent statements, this Court “will not speculate” on the claimed error. See Dy fort, ¶ 11. Consequently, we conclude that Aker’s allegations of ineffective assistance of counsel are not record based and we dismiss this portion of the appeal without prejudice. Dyfort, ¶ 12.
¶38 For the foregoing reasons, the judgment is affirmed.
CHIEF JUSTICE McGRATH, JUSTICES WHEAT, RICE and MORRIS concur.

 Lindberg was decided on November 18, 2008, three months after Hayden.