FILED

10/21/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0100

DA 25-0100

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 238

STATE OF MONTANA,

     Plaintiff and Appellee,

  v.

JEFFREY W. BURRINGTON,

     Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-23-449
Honorable Shane A. Vannatta, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

     Lance P. Jasper, Reep, Bell, & Jasper, P.C., Missoula, Montana

     For Appellee:

     Austin Knudsen, Montana Attorney General, Thad Tudor, Assistant
Attorney General, Helena, Montana

     Matt Jennings, Missoula County Attorney, Justin Ekwall, Deputy
County Attorney, Missoula, Montana

Submitted on Briefs:  July 23, 2025

Decided:  October 21, 2025

Filed:

_____
Clerk

Chief Justice Cory Swanson delivered the Opinion of the Court.

¶1 Jeffrey Burrington appeals his conviction for Aggravated Assault. Following a jury trial, the Fourth Judicial District Court for Missoula County sentenced Burrington to seven years in the Department of Corrections, all suspended. We affirm.

¶2 We restate the issues on appeal as follows:

*Issue One: Whether the District Court erred in denying Burrington's motion for a directed verdict.*

*Issue Two: Whether this Court should exercise plain error review over trial incidents to which Burrington did not object.*

*Issue Three: Whether the cumulative effect of errors warrants a new trial.*

### FACTUAL AND PROCEDURAL BACKGROUND

¶3 On July 22, 2023, Burrington was driving with his wife, Sally Burrington, when he began "tailgating" Ryan Williams's car. Williams pulled over, and the Burringtons stopped their vehicle behind him. Both parties stepped out of their vehicles. Williams asked Burrington, "What's wrong?" and Burrington became "extremely belligerent." As the altercation escalated, Burrington began accusing Williams of being from Washington. Burrington then punched Williams in the face, at which point Williams returned to his car and the Burringtons left in their vehicle. The next day, after suffering significant pain and swelling, Williams left work and went to the hospital. He was diagnosed with a fractured mandible. He filed a police report after his medical diagnosis.

¶4 The State charged Burrington with a single count of Aggravated Assault, a felony. Prior to the trial, the State also proposed a jury instruction for the lesser included offense

2

of Assault, a misdemeanor. Burrington filed a pretrial motion to dismiss, arguing the case should be dismissed because Williams did not suffer a serious bodily injury, and because Burrington was defending himself. The District Court denied the motion, holding Burrington's arguments were questions best left to the jury.

¶5 At trial, Williams testified to the altercation, stating he pulled over to the roadside because he believed there might have been an emergency. He described the altercation, explaining Burrington punched him first, and Williams then returned to his vehicle. A day after the altercation, Williams went to an urgent care facility, where he was diagnosed with a fractured mandible and referred to an oral surgeon. The oral surgeon recommended Williams start a liquid-only diet for six weeks. Williams did not need any surgical intervention for his injury. Williams testified he experienced "tingling" and soreness after the injury. He was unable to open his mouth completely for the first two or three weeks. Williams also testified he was unable to travel to fires on a helicopter for his job as a smokejumper, a forward-deployed wilderness firefighter. Instead, he was forced to hike when fighting fires. He testified about having to consume only yogurt, cottage cheese, and protein shakes, and losing weight due to the combination of dietary restrictions and hiking for work.

¶6 Dr. Richard Holtzen, who diagnosed Williams's injury, testified for the State. Using a scan of Williams's mandible, Dr. Holtzen described the injury.

> [H]e had continuous bone from . . . the joint way up there on the upper right, and the bone continuing all the way around his jaw was intact. So, it's . . . just that lower-right-hand corner that was -- was broken free from the rest of his jaw.

3

And it wasn't significantly displaced[,] . . . and there isn't a lot of pushing or pulling on that in that area. And, so, since he had, basically, continuous bone from the joint all the way around to the other side, it didn't require any treatment.

. . .

So, the treatment that I recommended was for him to just, basically, maintain a non-chewing diet, and not to do anything that would put any force on that that would be excessive.

. . .

[T]he potential [injury was,] if he banged it, or bumped it, or even ate real hard things, it could cause it to break through the rest of that neck. And then he would have a bigger problem, because he wouldn't have a continuous jaw.

So, I recommended that soft/liquid diet -- a soft/liquid diet for a period of about six weeks, which is typically what it takes for -- for a broken bone to become strong enough to endure force again.

Dr. Holtzen confirmed this injury would have caused Williams's tingling and soreness. Additionally, he testified the injury could cause "scarring in that musculature of the tissue around it, and [cause] discomfort when he opens and closes. That . . . wouldn't be unusual long-term after an injury like that."

¶7     After the State concluded its case, Burrington moved for a directed verdict. As the District Court summarized, Burrington argued "the evidence presented to the jury by the State was that there was no protracted loss or impairment of the function or process of a bodily member or organ." Burrington argued D. Holtzen's testimony described an injury which did not result in "protracted loss or impairment." The court denied the motion, concluding this was an issue best left for the jury. The court explained, "The Court did hear evidence, whether it's sufficient . . . to actually result in a finding of guilty will be left up to the jury."

4

¶8 During his case-in-chief, Burrington presented a dual defense strategy. First, Burrington asserted a defense of justifiable use of force (JUOF), arguing he was protecting himself and his wife from Williams. Second, Burrington sought to undermine the aggravated assault charge by arguing Williams did not suffer a serious bodily injury. This strategy attacked the State's theory of the case on two different, non-mutually-exclusive fronts: the jury could find the assault was justified, or it could find the assault was not aggravated.[1]

¶9 To support the JUOF defense, Burrington introduced two incidents relating to road rage. These incidents were meant to demonstrate Burringtons' fear during the event. Burrington's wife, Sally Burrington, testified first. She testified to both incidents. The first incident, which occurred in 1987, involved both Burrington and his wife being allegedly involved in a roadside incident where someone "pulled a gun" on them.[2] The second incident occurred in 2023, where another driver brandished a machete at Sally Burrington in a parking lot behind a gas station. Sally also testified about her husband's protective instincts towards his family.

---

[1] In its response to Burrington's motion to dismiss, the State argued Burrington should not be allowed to dispute the existence of a serious bodily injury if he is asserting JUOF, as JUOF requires Burrington to admit the underlying charge. However, as the State also acknowledged, "[T]his case may present a novel scenario for the defense in which Burrington essentially acknowledges having committed the lesser included offense, but not the primary offense charged." The JUOF defense does not require Burrington to admit the serious bodily injury element.

[2] Burringtons additionally used this incident to explain why they did not notify the police in this case. After the 1987 incident, the Independent Record allegedly published Burringtons' information and addresses, and the Burringtons were afraid of similar disclosure occurring in this case.

5

¶10    Responding to Sally's testimony, the State moved to admit prior bad acts evidence and filed a supporting point brief, seeking to introduce another prior road rage incident involving Burrington.  In 2017, Missoula Police Department responded to an incident involving Burrington and his son and a group of motorcyclists acting obnoxiously and "boxing in" his car.  During a verbal argument, Burrington punched one of the motorcyclists.  Burrington pled guilty to disorderly conduct.  The District Court denied the State's motion because: (1) the State, pretrial, indicated it did not intend to provide prior bad acts evidence and Burrington did not open the door to introduce this incident; and (2) the evidence was prejudicial.  As the court explained, "I think [the door] has been cracked open.  And if it goes open much further, I am going to let the prosecution walk through."

¶11    Burrington also testified about the two prior incidents introduced in Sally's testimony.  On cross-examination, the State inquired into more detail regarding these events.  As the State's questioning moved from the 2023 incident to the 1987 incident, Burrington's attorney—anticipating the State was asking about the excluded 2017 incident—objected to the State's question.  The court explained defense counsel was mistaken, stating "He's talking about Ms. Burrington's previous road rage."  Burrington did not object to the court's reference of the 1980's incident as "Ms. Burrington's previous road rage."

¶12    In its closing, the State argued Burrington's portrayal of himself as the victim of Williams was unpersuasive.  The State argued Burrington threw the only punch and

escalated the situation by leaving his vehicle and approaching Williams. The State also argued the evidence shows Williams suffered a protracted impairment of bodily function.

¶13 In his closing statement, Burrington challenged Williams's portrayal of himself as a victim. Burrington pointed to Williams's experience as a smokejumper, and stated,

> He's an individual that's an elite athlete, that hunts wolves, and, you know, gets within 10 feet of them, has no fear, but, here, testifying to you about this being a terrifying event.

Burrington argued Williams was the aggressor during the altercation and was now "trying to mislead the jury." Burrington also argued Williams's injury was not a serious bodily injury.

¶14 During rebuttal closing argument, the State countered Burrington's argument, pointing to contradictions in Burrington's testimony and consistency in Williams's testimony.

> But this also may be an area where -- where you do have to assess credibility. That's an important function of the jury.
>
> .   .   .
>
> I mean, remember what a big deal it was the first few days of the trial that Ryan Williams said, "I snapped." Remember how many times you had the defense attorney talking about that? We watched the videos, Ryan Williams never actually said that. And that's why he said he didn't remember saying that, because he actually didn't.
>
> Consider that when you're thinking about any other purported contradictions in Ryan Williams's statements. And also consider who is making a sincere effort to answer questions on even cross-examination. And -- and who's contradicting themselves. Who suddenly is having great difficulty in understanding questions. Who is interrupting the other attorney. These are all things that have bearing on credibility.

Consider, too, who is saying things that just seem ridiculous, because they don't want to agree with the other counsel and damage their case.

.  .  .

Jeffrey Burrington, "I don't get frustrated with other drivers." Do any of you guys think that's actually true? Do you think he's actually the most patient man in Missoula County and nothing that another driver does ever frustrates him?

And you have them denying that they are getting out of the vehicle and moving themselves closer to Ryan Williams. Possibly because they believe that's not really consistent with being afraid of him.

.  .  .

Now, the defense suggested that Ryan Williams was caught in a lie. There hasn't been any evidence that he was. But what does it look like when someone's caught in a lie? Does it look like someone being asked if they told the police that their husband was going to pop somebody, again? "Did you say that?" "No." "Are you saying you don't remember saying that, or are you saying you definitely didn't say that?" "No, I did not say that." Then you watch a video of them saying that to law enforcement.

Does it look like someone confidently saying that they are 110 percent certain that they took a picture before an incident, when their statement the very next day was that they didn't remember at what point it was, whether it was before or after the punch was thrown.

Does it look -- does getting caught in a lie look like someone being asked a question and looking at the Judge and asking, "Do I have to answer that?" Because what he said was so inconsistent with what the case he's presenting to you all today is.

¶15   The jury found Burrington guilty of Aggravated Assault. The District Court sentenced Burrington to seven years with the Department of Corrections, all suspended. Burrington now appeals his conviction.

**STANDARD OF REVIEW**

¶16 "[M]ixed questions of law and fact . . . [are] reviewed *de novo*." *State v. Swann*, 2007 MT 126, ¶ 17, 337 Mont. 326, 160 P.3d. 511 (citation omitted). "[A]ll denials of a directed verdict involve application of the law (i.e. the applicable statute) to the facts of the case." *Swann*, ¶ 17 (citation omitted). Thus, we review denial of a motion for a directed verdict de novo. *Swann*, ¶ 17.

¶17 "We generally do not review on appeal issues that were not raised before the district court." *State v. McDonald*, 2013 MT 97, ¶ 8, 369 Mont. 483, 299 P.3d 799. "When reviewing unpreserved claims of error, we employ the plain error doctrine sparingly, on a case-by-case-basis, considering the totality of circumstances of each case." *State v. George*, 2020 MT 56, ¶ 5, 399 Mont. 173, 459 P.3d 854 (citation omitted, internal quotations omitted). Simply asking this Court to "review an unpreserved issue under the plain error doctrine is not enough." *George*, ¶ 5 (citation omitted). The defendant must firmly convince this Court "the claimed error implicates a fundamental right and [plain error review] is necessary to prevent a manifest miscarriage of justice or that failure to review the claim may leave unsettled the question of fundamental fairness of the proceedings or may compromise the integrity of the judicial process." *George*, ¶ 5 (citation omitted).

¶18 Jury instructions in a criminal case are reviewed to determine whether, as a whole, they fully and fairly instruct the jury on the applicable law. *State v. Crawford*, 2002 MT 117, ¶ 15, 310 Mont. 18, 48 P.3d 706 (citation omitted). "A prosecutor's misconduct may

9

be grounds for reversing a conviction and granting a new trial if the conduct deprives the defendant of a fair and impartial trial." *McDonald*, ¶ 10.

¶19 "[W]e will reverse a conviction under the cumulative error doctrine only if accumulated errors prejudiced the defendant's right to a fair trial." *State v. Novak*, 2005 MT 294, ¶ 15, 329 Mont. 309, 124 P.3d 182 (citation omitted). "The existence of prejudice, however, must be proven by the defendant—mere allegations of error without proof of prejudice are inadequate to satisfy the doctrine." *Novak*, ¶ 35 (citation omitted).

## DISCUSSION

¶20 *Issue One: Whether the District Court erred in denying Burrington's motion for a directed verdict.*

¶21 "A directed verdict is only appropriate if, viewing the evidence in a light most favorable to the prosecution, there is no evidence upon which a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Swann*, ¶ 17 (citation omitted). If facts exist to support a guilty verdict, a directed verdict motion should be denied and the case should proceed to the jury. Burrington argues, as a matter of law, the injury described by Dr. Holtzen did not result in "protracted loss or impairment," therefore no rational trier of fact could have found Burrington guilty of the "serious bodily injury" element of Aggravated Assault.

¶22 To be found guilty of Aggravated Assault:

(1) A person commits the offense of aggravated assault if the person purposely or knowingly causes serious bodily injury to another or purposely or knowingly, with the use of physical force or contact, causes reasonable apprehension of serious bodily injury or death in another.

Section 45-5-202(1), MCA. Absent a serious bodily injury, Burrington would only be guilty of Assault, a lesser included offense, which does not require a serious bodily injury. A serious bodily injury is:

> (66)(a) "Serious bodily injury" means bodily injury that:
>
> .   .   .
>
> (ii) causes serious permanent disfigurement *or protracted loss or impairment of the function or process of a bodily member or organ . . . .*

Section 45-2-101(66)(a)(ii), MCA (emphasis added). As relevant here, the injury must be: (1) protracted, and (2) must cause loss or impairment. Burrington challenges both these elements. As the statute does not define either of these terms, we interpret them according to their plain meaning and ordinary usage. *State v. Garcia*, 2025 MT 25, ¶ 13, 420 Mont. 283, 563 P.3d 277 (citation omitted). We have also previously held the term protracted impairment is not vague, and it is not beyond the grasp of a jury in applying it. *State v. Trull*, 2006 MT 119, ¶ 34, 332 Mont. 233, 136 P.3d 551 (citation omitted).

¶23   In Burrington's case, the court denied the motion for directed verdict because:

> The Court heard, as the State pointed out, that there was limitations on eating; limitations on, frankly, speaking; limitations on being able to open; limitations -- issues of loss of sleep. And he testified to continuing tingling.

¶24   First, we must determine whether six weeks is not "protracted" as a matter of law. Protracted, used as an adjective in the statute, means "[l]engthened, extended, prolonged." *Protracted*, 12 *The Oxford English Dictionary* 703 (2d ed. 1989). A six-week injury could be considered protracted. Other courts' interpretation of the term "protracted" supports the conclusion six weeks could be protracted. *See, e.g., State v. Meyers*, 145 P.3d 821, 830–

11

31 (Haw. App. 2006) (four weeks of pain and discomfort considered protracted); *State v. Welton*, 300 N.W.2d 157, 160 (Iowa 1981) (fracture of the jaw preventing a victim from chewing food for six weeks is a "protracted loss or impairment"); *State v. Ross*, 939 S.W.2d 15, 19 (Mo. Ct. App. 1997) (seven days impairment sufficient to constitute protracted impairment); *People v. Hall*, 86 A.D.3d 450, 452 (N.Y. App. Div. 2011) (tracking defendant for three days is not considered "protracted" surveillance, as opposed to 65 days); *Huerta v. State*, 933 S.W.2d 648, 649 (Tex. Ct. App. 1996) (injury considered protracted when officer was unable to return to work for several days). Based on Dr. Holtzen's testimony, a rational trier of fact could have found Williams's six-week injury protracted.

¶25 Burrington also argues the injury did not cause impairment or loss of function. The parties do not dispute chewing food is a function of the mandible, and the mandible is a bodily member or an organ. The Oxford English Dictionary defines impairment as "deterioration; injurious lessening or weakening." *Impairment*, 8 *The Oxford English Dictionary* 703 (2d ed. 1989). Merriam-Webster similarly defines impairment as "diminishment or loss of function or ability." *Impairment*, *Merriam-Webster,* https://perma.cc/U22F-FV6G (last visited Oct. 16, 2025). The inability to masticate certain, otherwise-chewable foods due to the weakening of the mandible could be considered a weakening of function. Other jurisdictions have also found injuries to the mandible resulting in dietary restrictions could be considered as impairment. *See, e.g., Welton*, 300 N.W.2d at 160 (finding impairment of function when fractures of the lower jaw prevented the victim from chewing food for six weeks); *see also Cheatham v.*

12

*State*, 85 Wis. 2d 112, 119, 270 N.W.2d 194, 198 (1978) (Jury could have found skull fracture which only caused loss of feeling for six days to be protracted loss or impairment).

¶26    Burrington argues Williams's injury was not an impairment because a "temporary dietary modification does not equate to a loss of function." Burrington also argues, "Dr. Holtzen's testimony unequivocally established that Williams'[s] facial structure remained intact, with no asymmetry, instability, or deformity," and Williams did not need any medical intervention, suffering no prolonged pain, only "tingling". Burrington distinguishes other cases from Williams's injury because those cases required a jaw to be wired together. *See, e.g., State v. Swensen*, 2009 MT 42, ¶ 4, 349 Mont. 268, 203 P.3d 786 (Victim suffered "a severe concussion, facial lacerations requiring 33 stitches, a broken cheekbone, and numerous other lacerations").

¶27    We find this argument unpersuasive. First, Dr. Holtzen testified Williams's chewing would risk his fracture breaking through to the other side of the neck of the mandible, making the injury significantly worse. The dietary restriction was not merely a suggestion for comfort; it was a requirement to not exacerbate the injury. We are unwilling to fault a victim for taking a safe approach and minimizing the risk of aggravation, which resulted in a diminishment of function. Additionally, we are unwilling to conclude, as a matter of law, a mandibular fracture which does not go clean through the neck of the mandible causes less impairment than a fracture going all the way through the mandible. Based on the evidence presented at trial, a reasonable jury could find beyond reasonable doubt this fracture resulted in diminishment of function because it weakened the mandible.

13

¶28 Burrington also notes Williams was back to fighting wildfires within two days. Thus, he argues Williams's ability to function was not diminished. This evidence was presented to the jury and reiterated to the jury in Burrington's closing argument. It is within the purview of the jury to balance this evidence with the testimony from Williams and Dr. Holtzen. We conclude Williams's injury could be considered a serious bodily injury by a rational jury.

¶29 *Issue Two: Whether this Court should exercise plain error review over trial incidents to which Burrington did not object.*

¶30 Burrington challenges the District Court's comment about his wife's "road rage," the court's failure to remedy the comment with a jury instruction, and the County Attorney's closing argument statements about "lies." Burrington did not raise these issues during trial or request a prior acts jury instruction. Therefore, we review these issues for plain error. We only invoke the plain error doctrine "to correct [an] error not objected to at trial but that affects the fairness, integrity, and public reputation of judicial proceedings." *State v. Akers*, 2017 MT 311, ¶ 10, 389 Mont. 531, 408 P.3d 142 (citation omitted). "To reverse a decision for plain error, the appellant must: (1) demonstrate that the claimed error implicates a fundamental right; and (2) firmly convince this Court that a failure to review the claimed error would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process." *Akers*, ¶ 10 (citation omitted).

**District Court's Comment on "Ms. Burrington's Previous Road Rage"**

¶31    To justify his use of force, Burrington introduced two prior incidents involving anger from other drivers: the "gun incident" which occurred in the 1980s, and the "machete incident" which involved his wife, Sally. Burrington argued these incidents made him fearful for Sally's safety. Having opened the door to these incidents, the State cross-examined Burrington on both incidents. The State asked:

> STATE: Now, going into this you had talked to your wife about the earlier incident with the man with the machete, correct?
>
> BURRINGTON: Yes.
>
> STATE: And -- and you knew that you had been personally involved a long time back with, kind of, another carjacking, or -- or a road-rage-type incident that your wife was also there for?
>
> DEFENSE COUNSEL: Objection, Your Honor. Previously discussed and –
>
> THE COURT: No, no, no. *He's talking about Ms. Burrington's previous road rage.*
>
> DEFENSE COUNSEL: Initially was, but then went to the other area, Your Honor.
>
> STATE: I -- and, I guess, I'm asking about events that happened in the late '80s, if that clarification helps.
>
> DEFENSE COUNSEL: Yes.
>
> THE COURT: Objection overruled.

(Emphasis added.) After the State concluded its questioning on the 2023 incident, the State moved onto the 1980s incident. At this point, the defense counsel understood the question to be about the 2017 "motorcyclist" incident the court had excluded earlier that day. When explaining to defense counsel why his objection is incorrect, the court explained "No, no,

15

no. He's talking about Ms. Burrington's previous road rage." When objecting, defense counsel did not request to be heard outside the presence of the jury.

¶32 Burrington now argues the court calling the incident "Ms. Burrington's previous road rage" was a prejudicial comment by the court which amounted to plain error. Burrington asserts the comment makes it appear Sally was the aggressor, not the victim. The context of the statement shows the court used the term "previous road rage" as a shorthand way to refer to the 1980s incident. Since the testimony discussed two different road-rage events, the court was distinguishing between them by identifying the occasion when only Sally was present. The court was not commenting on the evidence itself.

¶33 Nor would this comment by the court warrant other acts jury instruction. The jury heard detailed testimony from Sally on the 1980s incident. The court's repetition of the prosecutor's question, coming a day later, could hardly override Sally's prior testimony. The State argued in its closing this was not a case about prior incidents involving the Burringtons. The State limited its discussion of the two admitted incidents to prove they did not support Burrington's JUOF defense. And the jury was instructed by the court, "No remarks I make or instructions I give are intended to express my opinion as to the facts in this case or what verdict you should return." Ultimately, it was Burrington who introduced this evidence in the first instance, opening the door for the State to challenge Burrington's characterization of the events, and did not object to the State's question or request other acts jury instruction. The comment and the lack of other acts instructions did not implicate Burrington's fundamental rights and failure to review it would not result in manifest injustice.

**State's Closing Argument**

¶34    Burrington argues the State committed prosecutorial misconduct by referring to Burrington's contradictions in its closing argument. Both the Sixth Amendment and Article II, § 22, of the Montana Constitution guarantee criminal defendants "the right to a fair trial by a jury." *State v. Aker*, 2013 MT 253, ¶ 24, 371 Mont. 491, 310 P.3d 506. The State's improper comments during closing argument "may be grounds for reversing a conviction and granting a new trial if the conduct deprives the defendant of a fair and impartial trial." *Aker*, ¶ 24 (quoting *McDonald*, ¶ 10). We "consider alleged improper statements during closing argument in the context of the entire argument." *Aker*, ¶ 24 (citation omitted). "We do not presume prejudice from the alleged prosecutorial misconduct; rather, the defendant must show [the closing argument] violated his substantial rights." *Aker*, ¶ 24 (quoting *McDonald*, ¶ 10) (internal quotations omitted). Because Burrington did not object to the State's closing argument during the trial, we review the issue for plain error.

¶35    "An attorney invades the jury's province and engages in highly improper behavior when he characterizes the defendant or witnesses as liars or offers personal opinions on a witness's credibility." *Aker*, ¶ 26 (citation omitted). On the other hand, "it is proper to comment on conflicts and contradictions in testimony, as well as to comment on the evidence presented and suggest to the jury inferences which may be drawn therefrom." *Aker*, ¶ 26 (quoting *State v. Daniels*, 2003 MT 247, ¶ 26, 317 Mont. 331, 77 P.3d 224) (internal quotations omitted).

¶36     Although the State "must avoid offering personal opinion, comment is appropriate on the gravity of the crime charged, the volume of evidence, credibility of witnesses, inferences to be drawn from various phases of evidence, and legal principles involved." *Aker*, ¶ 27 (citing *McDonald*, ¶ 14). "A prosecutor's argument is not plain error if made in the context of discussing the evidence presented and how it should be used to evaluate a witness's testimony under the principles set forth in the jury instructions." *Aker*, ¶ 27 (citing *McDonald*, ¶ 14).

¶37     In its rebuttal closing argument, the State referred to Burrington's contradictions and his behavior on the stand.

> Now, the defense suggested that Ryan Williams was caught in a lie. There hasn't been any evidence that he was. But what does it look like when someone's caught in a lie? Does it look like someone being asked if they told the police that their husband was going to pop somebody, again? "Did you say that?" "No." "Are you saying you don't remember saying that, or are you saying you definitely didn't say that?" "No, I did not say that." Then you watch a video of them saying that to law enforcement.
>
> Does it look like someone confidently saying that they are 110 percent certain that they took a picture before an incident, when their statement the very next day was that they didn't remember at what point it was, whether it was before or after the punch was thrown.
>
> Does it look -- does getting caught in a lie look like someone being asked a question and looking at the Judge and asking, "Do I have to answer that?" Because what he said was so inconsistent with what the case he's presenting to you all today is.

The State was responding to Burrington's closing argument, where Burrington argued Williams was trying to deceive the jury and was not the victim. In his closing, Burrington argued:

18

> He's an individual that's an elite athlete, that hunts wolves, and, you know, gets within 10 feet of them, has no fear, but, here, testifying to you about this being a terrifying event . . . .

The State's closing argument contrasted Williams's testimony with the contradictions in Burrington's story. The State then invited the jury to assess the credibility of the two. The jury was instructed on the issue of credibility:

> You are the sole judges of the credibility, that is, the believability, of all the witnesses testifying in this case, and of the weight, that is, the importance, to be given their testimony. In judging the effect of evidence you must be fair and impartial and not arbitrary.
>
> . . .
>
> In determining what the facts are in the case, it may be necessary for you to determine what weight should be given to the testimony of each witness. To do this you should carefully consider all the testimony given, the circumstances under which each witness has testified, and every matter in evidence that tends to indicate whether a witness is worthy of belief. You may consider:
>
> 1. The appearance of the witnesses on the stand, their manner of testifying, their apparent candor, their apparent fairness, their apparent intelligence, their knowledge and means of knowledge on the subject upon which they have testified.
> 2. Whether the witnesses have an interest in the outcome of the case or any motive, bias or prejudice.
> 3. The extent to which the witnesses are either supported or contradicted by other evidence in the case.
> 4. The capacity of the witnesses to perceive and communicate information.
> 5. Proof that the witness has a bad character for truthfulness.

¶38 A significant portion of the trial rested on credibility; the jury either could believe Williams when he stated he was not the first aggressor, or they could believe Burrington and his wife and their JUOF defense. While the prosecutor used the word "lie" during the rebuttal closing, defense counsel previously suggested Williams was "was trying to

19

mislead the jury" by portraying himself a victim. Without parsing each of the prosecutor's comments, in the final analysis—having reviewed the trial transcript and considered the comments in the context of the entire argument and in light of the specific evidence presented by both sides—we are not convinced failure to review Burrington's claims will result in a manifest miscarriage of justice, leave unsettled the fundamental fairness of his trial, or compromise the integrity of the judicial process. *See Aker*, ¶ 31.

¶39 In declining plain error review, we follow our prior caselaw, where we have refused plain error when a prosecutor's comments were even more egregious than in this case. *See Aker*, ¶ 30 (collecting cases).

¶40 *Issue Three: Whether the cumulative effect of errors warrants a new trial.*

¶41 The cumulative error doctrine applies in the rare case in which several errors occur, the cumulative effect of which is to deny the defendant the right to a fair trial. *Novak*, ¶ 35. Under the doctrine, a defendant is required to prove that the aggregate effect of the errors denied him a fair trial—mere allegations and speculation that prejudice occurred are insufficient. *Novak*, ¶ 35. If prejudice is shown, however, reversal is required. *State v. Enright*, 2000 MT 372, ¶ 34, 303 Mont. 457, 16 P.3d 366 (citation omitted).

¶42 When considering the cumulative effect of several claimed errors, courts consider:

> each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose . . . ; and the strength of the government's case.

*State v. Lawrence*, 2016 MT 346, ¶ 30, 386 Mont. 86, 385 P.3d 968 (quoting *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993)) (Baker, J., concurring).

20

¶43 Having concluded the court's comment during the objection and the State's "lie" comment did not constitute plain error, we also conclude, taken together, they do not cumulatively prejudice Burrington's right to a fair trial. Burrington received a fair trial with a well thought-out JUOF strategy. The State did not engage in prosecutorial misconduct. The State did not make any inappropriate other acts arguments. The court's comment, when ruling on an objection, did not impugn Sally Burrington's character. Having received a fair trial, Burrington failed to show prejudice.

## CONCLUSION

¶44 The District Court is affirmed.

/S/ CORY J. SWANSON

We Concur:


/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ JIM RICE